2008 OK 43

**Charles GARNETT, Plaintiff/Appellant,**

**v.**

**GOVERNMENT EMPLOYEES INSURANCE COMPANY, a Maryland Corporation, Defendant/Appellee.**

No. 103,332.

Supreme Court of Oklahoma.

May 6, 2008.

As Corrected May 14, 2008.

Michael W. Phillips, Oklahoma City, Oklahoma, for Appellant.

Gerard F. Pignato, Brad L. Roberson, Mark B. Houts, Oklahoma City, Oklahoma, for Appellee.

KAUGER, J.

¶ 1 The issues presented are whether the trial court erred by: 1) sanctioning the passenger's counsel for disclosing the amount of a settlement offer made by the insurer during court-ordered mediation; 2) granting partial summary judgment to the insurer on the issue of bad faith; and 3) denying the insurer's motion for a new trial on the grounds of the exclusion of testimony by the investigating officer. We find the trial court erred by sanctioning the passenger's counsel. We otherwise affirm the decisions of the trial court.

## FACTS

¶ 2 On August 20, 2002, Douglas Hargrove (the driver) and his passenger Charles Garnett (the passenger) were in the driver's compact pickup truck, stopped at a traffic light on Robinson Street in Norman. Brady Fain's (Fain) car was also idling at the light, just behind the driver's pickup. Mistakenly thinking the light had changed, Fain rear-ended the driver's pickup. The passenger alleged that he struck his head against the back glass of the pickup, and subsequently suffered migraine headaches. Neither Fain nor the driver alleged any injury. Both Fain and the driver were insured by Government Employees Insurance Company (the insurer) at the time of the accident. The passenger retained counsel and made a claim against the insurer for medical expenses and lost wages, pain and suffering, and mental anguish.

¶ 3 On August 23, 2002, Dana Underwood, a claims examiner for the insurer, contacted the passenger in order to obtain a statement, but when she learned that he was represented by counsel, she ended the call. On September 3, 2002, the passenger's counsel sent the insurer a letter of representation in which he stated that an underinsured motorist (UIM) claim would likely be asserted. On September 4, 2002, the insurer assigned Kevin Kahtava to the potential UIM claim. On October 14, 2002, Fain's mother, Marilyn Fain, notified the insurer that it insured her vehicle. The insurer opened a liability file and assigned Randy Williams (liability examiner) to the liability claim. The insurer created separate claim numbers for the UIM and liability claims. On October 16, 2002, the liability examiner notified the passenger's counsel that he was assigned to the liability claim. On November 15, 2002, Jerry Purvis (UIM examiner) took over the UIM file from

Kevin Kahtava. On December 31, 2002, the passenger's counsel made a UIM demand to the liability examiner.

¶ 4 On January 14, 2003, the liability examiner received the passenger's demand package, which included $6,510.50 in medical expenses and $716.16 in lost wages. On January 15, 2003, the liability examiner offered the passenger $8,700 to settle the liability claim. On January 17, 2003, after considering the passenger's demand package, the UIM examiner valued the total claim at $11,000 to $13,000, and by subtracting the liability policy limits, valued the UIM claim at $1,000 to $3,000. On January 24, 2003, the UIM examiner offered the passenger $1,000 to settle the UIM claim. The passenger's counsel appears to have misunderstood the offer as $11,000 to settle the UIM claim.

¶ 5 On January 28, 2003, the passenger's counsel contacted the liability examiner and requested the $15,000 limits of the UIM policy. On January 28, 2003, the liability examiner settled the liability claim for the $10,000 policy limit. Throughout these negotiations, the passenger's counsel often mistakenly used the liability claim number when referring to the UIM claim and vice versa. When negotiations on the UIM claim were not fruitful, on March 26, 2003, Denise Thompson, the UIM examiner's supervisor (the supervisor), called the passenger's counsel and offered $2000 to settle the UIM claim. On April 3, 2003, the passenger's counsel counter-offered to settle the UIM claim for $14,000. On May 6, 2003, the supervisor offered $3,000 to settle the UIM claim, the full amount at which the insurer had valued the claim.

¶ 6 The passenger then deemed the $3000 an "undisputed amount" and demanded payment of the $3000 without settlement of the claim. The insurer refused, and on July 10, 2003, the passenger brought an action in district court alleging breach of contract and bad faith for the insurer's refusal to pay the "undisputed amount" and improper "dual representation" for the insurer's alleged leveraging of the liability and UIM claims against each other to prevent a fair valuation of either. The insurer moved for partial summary judgment on the issues of bad faith. The trial court granted the insurer's motions on both issues, leaving only the breach of contract claim to be litigated.

¶ 7 On September 9, 2005, the trial court ordered that the parties attend mediation pursuant to the District Court Mediation Act, 12 O.S. §§ 1821–1825, (the Mediation Act). On September 23, 2005, the parties attended mediation, but could not reach a settlement. On October 17, 2005, before the trial began before District Judge Tom A. Lucas, the passenger submitted motions *in limine* seeking to prohibit the insurer's counsel from: 1) mentioning collateral sources; 2) eliciting testimony from the investigating officer; and 3) suggesting or implying that the passenger's counsel fostered perjury from the passenger's treating physician. The parties argued the motions in chambers, and the trial court granted all three motions. During opening statements, Gerard F. Pignato, counsel for the insurer, stated that the investigating officer determined that there were no injuries sustained by the passenger. The passenger objected and the trial court sustained the objection and advised the jury to disregard counsel's statements about the investigating officer. Later in the opening statement, the insurer's counsel claimed that the passenger's expert medical witness "churned fees" and agreed to testify as "part of the deal." The trial court called counsel to the bench and advised the passenger's counsel that if he moved for a mistrial, it would be granted. The passenger's counsel so moved, and the trial court declared a mistrial.

¶ 8 On November 28, 2005, the passenger moved for sanctions against the insurer for its attorney's conduct in the first trial. The passenger also based his motion for sanctions on what he considered an unreasonably low settlement offer made by the insurer during mediation, the amount of which he disclosed in the first sentence of his motion for sanctions. On November 30, 2005, the insurer responded by moving for sanctions against the passenger and his counsel, Michael W. Phillips, for revealing the settlement amount offered in mediation, which the insurer al-

leged violated the Mediation Act.[1] On December 21, 2005, District Judge William C. Hetherington, Jr. awarded $2500 in sanctions to the insurer against the passenger's counsel, and awarded attorney fees to the passenger against the insurer.

¶ 9 The second trial was held on February 1–2, 2006, again before Judge Lucas. At its conclusion, the jury awarded the passenger a total of $15,000 in damages, with credit to the insurer for the $10,000 paid under the liability policy, leaving $5000 to be paid under the UIM policy. On March 7, 2006, the insurer moved for a new trial based on the trial court's rejection of opinion testimony by the investigating officer on the vehicles' speed at the time of impact. The trial court denied the motion, and both parties appealed.

¶ 10 We assigned the cause to the Court of Civil Appeals on February 1, 2007. On October 18, 2007, the Court of Civil Appeals, in an unpublished opinion, affirmed the rulings of the trial court on the insurer's motion for partial summary judgment on the issue of bad faith, the parties' motions for sanctions, and the insurer's motion for new trial. The passenger filed his petition for certiorari on November 6, 2007. On January 15, 2008, we granted certiorari.

### I.

### THE TRIAL COURT ABUSED ITS DISCRETION BY SANCTIONING THE PASSENGER'S COUNSEL.

¶ 11 In the passenger's motion for sanctions against the insurer, he disclosed the amount of a settlement offer made by the insurer during mediation. The insurer then moved for sanctions against the passenger and his counsel for violating the Mediation Act. The trial court awarded attorney fees to the passenger and sanctioned the passenger's attorney in the amount of $2500.

1. Title *12 O.S.2001 § 1824* (6), see ¶ *13, infra.*

2. Title *12 O.S.2001 § 1824* (6). Section 1823 provides:
   Any district court, by agreement of the parties, may refer any civil case, including any domestic relations case, or any portion thereof for

¶ 12 The passenger argues that the trial court erred by imposing sanctions before conducting a show cause hearing or· allowing him to withdraw or amend his pleading as required by 12 O.S. Supp.2004 § 2011. He also argues that he did not violate the Mediation Act, 12 O.S.2001 § 1824(6), because he did not enter the terms of the insurer's settlement offer into evidence, but rather disclosed it in a pleading. The insurer argues that the passenger did violate § 1824(6), and the trial court was not required to conform to the requirements of § 2011 because it awarded sanctions under its inherent, equitable power to do so.

■ ¶ 13 The Mediation Act was promulgated by the Legislature in 1998 to enable district courts, by agreement of the parties, to refer pending civil cases to mediation in order to promote settlement.[2] The Mediation Act emphasizes that mediation proceedings are to be private and confidential. Section 1824(6) provides in pertinent part:

> Any communication relating to the subject matter of the dispute made during the mediation process by a participant or any other person present at the mediation shall be a confidential communication. No admission, representation, statement, or other confidential communication made in setting up or in conducting the mediation shall be admissible as evidence or subject to discovery, except that, no fact independently discoverable shall be nondiscoverable solely by virtue of having been disclosed in such confidential communication. There shall be no stenographic or electronic record, including audio or video, of the mediation process unless it is agreed upon by the parties, interested non-parties, and the mediator, and it is not otherwise prohibited by law. No participant in the mediation proceeding, including the mediator, shall be subpoenaed or otherwise compelled to disclose any matter disclosed in

mediation. A referral to mediation may be made at any time while a civil case is pending. The order of referral to mediation shall be entered on a standard form consistent with the form provided in subsection D of Section 5 of this act.

the process of setting up or conducting the mediation proceeding.... [3]

The Legislature intended that communications made during mediation proceedings remain confidential.[4] Here, the passenger's counsel disclosed the insurer's settlement offer in the first sentence of a motion for sanctions that otherwise centered on the insurer's counsel's conduct in the first trial.[5] This is conduct that is clearly proscribed by the Mediation Act.

¶ 14 We review a sanction ruling for an abuse of discretion.[6] To reverse for abuse of discretion, we must determine the trial court made a clearly erroneous conclusion and judgment, against reason and evidence.[7] Although we examine and weigh any proof in the record, we abide the presumption that the lower court decision on the sanction question is legally correct and cannot be disturbed unless it is contrary to the weight of the evidence or to a governing principle of law.[8]

¶ 15 Title 12 O.S. Supp.2004 § 2011 provides a statutory basis for the award of sanctions under certain limited circumstances.[9] Like its federal counterpart, Fed.

3. Title 12 O.S.2001 § 1824(5) provides:
   Mediation sessions shall be private. Persons other than the parties and interested non-parties and their representatives may attend only with the consent of the parties, interested non-parties, and the mediator....

4. See 12 O.S.2001 § 1824(6), ¶ 13, supra.

5. Plaintiff's Application for Sanctions, November 28, 2005, Record p. 498 provides in pertinent part:
   ... 1. On September 23, 2005, this case was mediated pursuant to Court Order. At the mediation, Defendant offered $500.00 above the last offer for a total of $3,500.00. The offer was couched as being final and non-negotiable. The mediation costs incurred by Plaintiff nearly exceeded the additional offer from Defendant. Accordingly, the case proceeded to trial....

6. *State ex rel. Tal v. City of Oklahoma City*, 2002 OK 97, ¶ 2, 61 P.3d 234; *Hammonds v. Osteopathic Hosp. Founders Ass'n*, 1996 OK 100, ¶ 6, 934 P.2d 319; *Broadwater v. Courtney*, 1991 OK 39, ¶ 6, 809 P.2d 1310.

7. *Conoco Inc. v. Agrico Chem. Co.*, 2004 OK 83, ¶ 14, 115 P.3d 829; *Finnell v. Jebco Seismic*, 2003 OK 35, ¶ 8, 67 P.3d 339; *Abel v. Tisdale*, 1980 OK 161, ¶ 20, 619 P.2d 608.

8. *State ex rel. Tal v. City of Oklahoma City*, see note 6, supra; *Warner v. Hillcrest Med. Center*, 1995 OK CIV APP 123, ¶ 49, 914 P.2d 1060.

9. Title 12 O.S. Supp.2004 § 2011(B–C) provides:
   B. REPRESENTATIONS TO COURT. By presenting to the court, whether by signing, filing, submitting, or later advocating, a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
   1. It is not being presented for any improper or frivolous purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
   2. The claims, defenses and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
   3. The allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
   4. The denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.
   C. SANCTIONS. If, after notice and a reasonable opportunity to respond, the court determines that subsection B of this section has been violated, the court shall, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subsection B of this section or are responsible for the violation.
   1. HOW INITIATED.
   a. By Motion. A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subsection B of this section. It shall be served as provided in Section 2005 of this title, but shall not be filed with or presented to the court unless, within twenty-one (21) days after service of the motion or such other period as the court may prescribe, the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected. If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorneys fees incurred in presenting or opposing the motion. Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees.
   b. On Court's Initiative. On its own initiative, the court may enter an order describing the specific conduct that appears to violate subsection B of this section and directing an

R.Civ.P. 11, Section 2011 requires an attorney make reasonable inquiry to assure all motions, pleadings and papers filed with a court have a factual basis, are legally tenable and are not submitted for an improper purpose.[10] The purpose of § 2011 is to discourage presenting pleadings, written motions, or other papers to a court that are legally and/or factually frivolous, or presented for an improper purpose, such as delay.[11] The central goal of § 2011 is to deter baseless filings.[12] Sanctions exist to ensure the orderly and proper functioning of the legal system and serve the dual purposes of deterring and punishing offending conduct.[13] However, they should not be, and are not intended to be, a device to chill novel legal theories that, although unlikely to succeed, have a reasonable basis in law and fact.[14]

▉ ¶16 Title 12 O.S. Supp.2004 § 2011(C)(a) provides:

By Motion. A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subsection B of this section. It shall be served as provided in Section 2005 of this title, but shall not be filed with or presented to the court unless, within twenty-one (21) days after service of the motion or such other period as the court may prescribe, the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected. If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorneys fees incurred in presenting or opposing the motion. Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees.

Under the plain meaning of the words, prior to filing a sanction motion pursuant to § 2011(C), the moving party must serve the motion on the offending party and wait at least twenty-one days. The moving party may only file the motion if the offending party does not withdraw or appropriately correct the challenged paper, claim, defense, contention, allegation, or denial within twenty-one days after service.[15]

▉ ¶17 In order to levy sanctions, the trial court was required to follow the statutory procedure found in § 2011. On November 23, 2005, the passenger filed his motion

attorney, law firm, or party to show cause why it has not violated subsection B of this section with respect thereto.
2. NATURE OF SANCTIONS; LIMITATIONS. A sanction imposed for violation of this section shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Subject to the limitations in subparagraphs a, b and c of this paragraph, the sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys fees and other expenses incurred as a direct result of the violation.
a. Monetary sanctions shall not be awarded against a represented party for a violation of paragraph 2 of subsection B of this section.
b. Monetary sanctions shall not be awarded on the court's initiative unless the court issues its order to show cause before a voluntary dismissal or settlement of the claims made by or against the party which is, or whose attorneys are, to be sanctioned.
c. Monetary sanctions shall be awarded for any violations of paragraph 1 of subsection B of this section. The sanctions shall consist of an order directing payment of reasonable costs, including attorney fees, incurred by the movant with respect to the conduct for which the sanctions are imposed. In addition, the court may impose any other sanctions authorized by this paragraph.
3. ORDER. When imposing sanctions, the court shall describe the conduct determined to constitute a violation of this section and explain the basis for the sanction imposed.

**10.** *State ex rel. Tal v. City of Oklahoma City*, see note 6, supra at ¶17; *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

**11.** *Cooper v. Booher*, 2004 OK 40, ¶7, 93 P.3d 19.

**12.** *State ex rel. Tal v. City of Oklahoma City*, see note 6, supra at ¶17; *Cooter & Gell v. Hartmarx Corp.*, see note 10, supra.

**13.** *Cities Serv. Co. v. Gulf Oil Corp.*, 1999 OK 16, ¶8, 976 P.2d 545.

**14.** *TRW/Reda Pump v. Brewington*, 1992 OK 31, ¶13, 829 P.2d 15.

**15.** *Cooper v. Booher*, see note 11, supra.

for sanctions containing the offending disclosure of the settlement offer. Seven days later, on November 30, 2005, the insurer served the passenger with and also filed its motion for sanctions, ignoring the twenty-one day opportunity for the passenger to withdraw, as required by § 2011(C)(a). Therefore, the trial court had no authority to sanction the passenger's counsel under § 2011.

■■■ ¶ 18 The insurer argues that the trial court was not required to conform to the requirements of § 2011 because it sanctioned the passenger's counsel under its inherent, equitable power to impose sanctions. A trial court has the inherent authority to sanction a party or an attorney for bad faith litigation misconduct.[16] However, sanctions assessed under a trial court's inherent, equitable powers are not to be awarded lightly or without fair notice and a hearing.[17]

■■ ¶ 19 As the North Carolina Court of Appeals held in *Few v. Hammack Enterprises, Inc.*, 132 N.C.App. 291, 511 S.E.2d 665, 669 (1999), the purpose of maintaining the confidentiality of communications made during mediation is

... to prevent a chilling effect on settlement negotiations by allowing parties to freely make settlement offers without fear that these offers would be revealed to a subsequent finder of fact as some evidence of liability on either the present or a future substantive claim.

The passenger's counsel did not disclose the settlement offer before a jury or even to Judge Lucas, who was presiding over the trial. He made the offending disclosure in a motion for sanctions filed with Judge Hetherington. His disclosure could not possibly have affected the insurer's liability on the underlying claim. While Judge Hetherington did conduct a hearing on the parties' motions for sanctions, the passenger was never given an opportunity to withdraw or amend his motion for sanctions. Imposition of sanctions under these circumstances was premature and excessive. Because the trial court had no authority to sanction the passenger's counsel under § 2011(C)(a) and an order of sanctions under the circumstances of the cause was an excessive extension of the trial court's inherent powers, the trial court abused its discretion by sanctioning the passenger's counsel.

## II.

## THE TRIAL COURT DID NOT ERR BY GRANTING PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF BAD FAITH.

¶ 20 The passenger also alleges that the trial court erred by granting summary judgment to the insurer on the issue of whether its refusal to pay $3000, the alleged "undisputed amount" of the UIM claim, constituted bad faith. The insurer contends that the amount in question was not "undisputed," and that because there was a legitimate dispute over the value of the UIM claim, its refusal to pay the amount did not constitute bad faith.[18]

■■■ ¶ 21 Summary judgment is properly granted when there are no disputed questions of material fact and the moving party is entitled to judgment as a matter of law.[19] All conclusions drawn from the evidentiary materials submitted to the trial court are viewed in the light most favorable to the party opposing the motion.[20] When

16. *Walker v. Ferguson*, 2004 OK 81, ¶¶ 11–12, 102 P.3d 144; *State ex rel. Tal v. City of Oklahoma City*, see note 6, supra.

17. *First National Bank & Trust Co. of Vinita v. Kissee*, 1993 OK 96, ¶ 47, 859 P.2d 502; *Winters v. City of Oklahoma City*, 1987 OK 63, ¶ 17, 740 P.2d 724.

18. Rather than argue that it owed no duty of good faith and fair dealing to the passenger, the insurer insisted that it did not engage in bad faith conduct. Because we find that the insurer engaged in no bad faith conduct, we express no opinion on whether it owed such a duty.

19. *South Tulsa Citizens Coalition, L.L.C. v. Arkansas River Bridge Auth.*, 2008 OK 4, ¶ 10, 176 P.3d 1217; *Wathor v. Mutual Assurance Adm'rs, Inc.*, 2004 OK 2, ¶ 4, 87 P.3d 559; *Oliver v. Farmers Ins. Group of Companies*, 1997 OK 71, ¶ 6, 941 P.2d 985.

20. *Sullivan v. Buckhorn Ranch Partnership*, 2005 OK 41, ¶ 23, 119 P.3d 192; *Green v. Harris*, 2003 OK 55, ¶ 11, 70 P.3d 866; *K & K Food Servs., Inc. v. S & H, Inc.*, 2000 OK 31, ¶ 16, 3 P.3d 705.

summary judgment involves only legal questions, the standard of review of a trial court's grant of summary judgment is *de novo*.[21]

¶ 22 Every insurance contract carries with it the duty to act fairly and in good faith in discharging its contractual responsibilities.[22] A party prosecuting a claim of bad faith carries the burden of proof and must plead all the elements of the intentional tort.[23] The essence of the tort is the unreasonable, bad-faith conduct of the insurer.[24] A central issue is whether the insurer had a good faith belief in some justifiable reason for the actions it took or omitted to take that are alleged to be violative of the duty of good faith and fair dealing.[25] Before the issue of an insurer's alleged bad faith may be submitted to the jury, the trial court must first determine as a matter of law, under the facts most favorably construed against the insurer, whether the insurer's conduct may be reasonably perceived as tortious.[26] It is not a breach of the duty of good faith for an insurer to resort to a judicial forum to settle legitimate disputes as to the validity or amount of an insurance claim.[27]

¶ 23 Here, the passenger established that he had sustained $7226.66 in damages for medical expenses and lost wages. He also alleged that he sustained damages for pain and suffering and mental anguish. The insurer valued his UIM claim somewhere between $1,000 and $3,000. The passenger argued that the claim should have been valued somewhere between $13,000 and $15,000. Ultimately, the jury awarded the passenger $5,000, a number greater than the insurer's estimate, but closer to the insurer's range than to the passenger's. Clearly, the UIM claim was legitimately disputed, as evidenced by the jury's award. Because a legitimate dispute existed between the parties as to the value of the UIM claim, the trial court did not err by granting summary judgment to the insurer on the issue of whether the insurer's failure to tender the "undisputed amount" constituted bad faith.

¶ 24 As part of his bad faith claim, the passenger also alleges that the insurer engaged in "dual representation"—that the insurer's employee working the UIM claim and the insurer's employee working the liability claim conferred and colluded, thus preventing either from reaching a fair estimate of the value of the passenger's claims. The insurer responds that there was no showing that the adjusters acted in bad faith.

¶ 25 The duty of an insurer who insures both parties in an accident has rarely been specifically addressed in federal or state jurisprudence, and is an issue of first impression in this Court. We have consistently held that in order to establish a bad faith claim, a party must show that the insurer engaged in unreasonable, bad faith conduct.[28] This principle may be seen underlying examples of bad faith conduct by insurers who insure both parties to an accident found in

**21.** *South Tulsa Citizens Coalition, L.L.C. v. Arkansas River Bridge Auth.*, see note 19, supra; *Head v. McCracken*, 2004 OK 84, ¶ 3, 102 P.3d 670; *In re. Estate of MacFarline*, 2000 OK 87, ¶ 3, 14 P.3d 551.

**22.** *Brown v. Patel*, 2007 OK 16, ¶ 9, 157 P.3d 117; *Timmons v. Royal Globe Ins. Co.*, 1982 OK 97, ¶ 13, 653 P.2d 907; *Christian v. American Home Assurance Co.*, 1977 OK 141, ¶ 25, 577 P.2d 899.

**23.** *Manis v. Hartford Fire Ins. Co.*, 1984 OK 25, ¶ 6, 681 P.2d 760; *McCorkle v. Great Atlantic Ins. Co.*, 1981 OK 128, ¶ 20, 637 P.2d 583.

**24.** *Buzzard v. Farmers Ins. Co., Inc.*, 1991 OK 127, ¶ 12, 824 P.2d 1105; *Manis v. Hartford Fire Ins. Co.*, see note 23, supra; *McCorkle v. Great Atlantic Ins. Co.*, see note 23, supra; *Christian v. American Home Assurance Co.*, see note 22, supra at ¶ 26.

**25.** *Badillo v. Mid Century Ins. Co.*, 2005 OK 48, ¶ 28, 121 P.3d 1080; *Buzzard v. McDanel*, 1987 OK 28, ¶ 10, 736 P.2d 157.

**26.** *Badillo v. Mid Century Ins. Co.*, see note 25, supra; *Manis v. Hartford Fire Ins. Co.*, see note 23, supra at ¶ 13; *Peters v. American Income Life Ins. Co.*, 2003 OK CIV APP 62, ¶ 37, 77 P.3d 1090.

**27.** *Claborn v. Washington Nat'l Ins. Co.*, 1996 OK 8, ¶ 14, 910 P.2d 1046; *Conti v. Republic Underwriters Ins. Co.*, 1989 OK 128, ¶ 8, 782 P.2d 1357; *McCorkle v. Great Atlantic Ins. Co.*, see note 23, supra at ¶ 22; *Christian v. American Home Assurance Co.*, see note 22, supra at ¶ 26.

**28.** See note 24, supra.

other decisions of other courts. These include: 1) using delay in settling one claim to force unfair settlement of the other;[29] 2) making knowing misrepresentations to force an insured to accept an unfair settlement;[30] 3) failing to disclose the nature of its relationship to each party;[31] 4) using conflicting defenses against each party;[32] and 5) using a single adjustor for both claims, who makes fraudulent misrepresentations to both parties.[33]

¶ 26 The case of *United Services Automobile Ass'n v. Bult*, 183 S.W.3d 181 (Ky.Ct. App.2003), is particularly instructive. In *Bult*, both the tortfeasor driver and the deceased passenger in a one car accident were covered by the same insurance company. The passenger's estate argued that the insurance company's use of one adjuster for the accident constituted bad faith. The Kentucky Court of Appeals acknowledged that the use of one adjuster for both claims created the potential for a conflict of interest, but found that:

> ... [T]he existence of a mere potential for conflict does not suffice to meet the burden of proof (for bad faith). It was incumbent upon (the plaintiffs) to prove that (the insurance company) did in fact act improperly in handling their claims. The potential for mischief must be shown to have ripened into the reality of tortious conduct.[34]

¶ 27 Here, just as in *Bult*, the passenger has shown nothing more than the potential for a conflict of interest created by the coincidence that the insurer happened to insure both Fain and the driver. The insurer used separate examiners and claim numbers for the liability and UIM claims. Each examiner's estimate of the value of the claim proved

to be very close to the jury's ultimate award. The liability examiner paid the full liability policy limits within two weeks of receiving the passenger's demand package. The passenger makes much of the fact that the examiners communicated. However, the major reason for any communication between the examiners was that the passenger often submitted claim information to the wrong examiner or under the wrong claim number. There was no evidence offered by the passenger that the examiners unreasonably delayed settlement, sought to leverage one claim against the other, made any misrepresentations to the passenger, or otherwise engaged in any actions that could be reasonably perceived as tortious. The trial court did not err by granting summary judgment to the insurer on the issue of whether the insurer engaged in bad faith "dual representation."

## III.

## THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING THE INSURER'S MOTION FOR NEW TRIAL.

¶ 28 The insurer argues that the trial court erred by refusing to admit the testimony of the investigating officer on the issue of the speed of the collision, and thus the trial court erred in denying its motion for a new trial. The passenger argues that because there were no skid marks left by either vehicle, under the teaching of *Fidelity & Cas. Co. of New York v. Hendrix*, 1968 OK 53, 440 P.2d 735, the officer's testimony was correctly excluded.

¶ 29 This Court has long recognized that a trial court is vested with wide discretion in granting a new trial.[35] We re-

29. *Darlow v. Farmers Ins. Exch.*, 822 P.2d 820, 825 (Wyo.1991).

30. *McCarter v. State Farm Mut. Auto. Ins. Co.*, 130 Ill.App.3d 97, 85 Ill.Dec. 416, 473 N.E.2d 1015, 1019 (1985).

31. *State Farm Mut. Auto. Ins. Co. v. Ling*, 348 So.2d 472, 475 (Ala.1977); *Hilmer v. Hezel*, 492 S.W.2d 395, 396 (Mo.Ct.App.1973).

32. *Colton v. Hartford Fire Ins. Co.*, 135 So.2d 489, 490 (La.Ct.App.1961).

33. *United Services Automobile Ass'n v. Bult*, 183 S.W.3d 181, 188 (Ky.Ct.App.2003); *Lee v. Killian*, 761 S.W.2d 139, 141 (Tex.Ct.App.1988).

34. *United Services Automobile Ass'n v. Bult*, see note 33, supra.

35. *Taliaferro v. Shahsavari*, 2006 OK 96, ¶ 14, 154 P.3d 1240; *Capshaw v. Gulf Ins. Co.*, 2005 OK 5, ¶ 7, 107 P.3d 595; *Public Serv. Co. of Okla. v. Brown*, 1998 OK 121, ¶ 6, 972 P.2d 354.

view a trial court's order denying a motion for new trial for error of a pure question of law or for an abuse of discretion which is arbitrary, clearly against the evidence, and manifestly unreasonable.[36]

¶ 30 The insurer consistently argued that the collision that gave rise to this cause occurred at a very low speed. The insurer did not dispute Fain's negligence or liability, but argued that the low-impact collision did not result in any serious injury to the passenger. One means by which the insurer sought to establish this contention was the testimony of Norman Police Officer Shawn Hawkins (investigating officer/officer), the police officer who was first called to the scene of the accident. The officer could have testified that because there were no skid marks left behind by either vehicle, the collision occurred at a very low rate of speed. In pre-trial motions, the passenger, citing *Hendrix*, sought to exclude this testimony on the grounds that without any skid marks, there was no way for the officer to mathematically establish the speed of either vehicle at the time of impact. The trial court granted the passenger's motion *in limine* on this issue, and excluded the evidence at trial.

¶ 31 In *Hendrix*, this Court addressed a strikingly similar question. There, Hendrix was injured when a school bus in which she was a passenger slid off the road and struck an embankment. She brought an action against the school district's insurer, Fidelity & Casualty Co. of New York (Fidelity). At trial, an investigating highway patrolman (patrolman) testified that he estimated the speed of the bus to have been 35 miles per hour at the time of the accident. However, he testified that because the accident occurred on a muddy road, there were no skid marks. Also, because he did not arrive until

two hours after the accident had occurred, he could not distinguish the wheel ruts left by the bus from those made by other vehicles after the accident. The jury returned a verdict in favor of Hendrix, and Fidelity moved for a new trial on the basis of the admission of the patrolman's testimony. The trial court denied the motion, and Fidelity appealed.

¶ 32 On appeal, this Court held that the trial court committed reversible error by admitting the testimony of the patrolman and remanded the cause for a new trial. In its opinion, the Court held:

> ... [T]here were no skid marks from which a speed could be estimated by any mathematical calculation. Further, the patrolman did not conduct his investigation until almost two hours after the accident and there had been other traffic on the muddy road which had at least partially obliterated the tire tracks of the bus ... In our opinion, the opinion evidence in the instant case is conjectural and is based on facts from which the jury could be expected to draw for themselves as accurate a conclusion as that of the patrolman as to the speed of the bus.[37]

¶ 33 Likewise, in the instant cause, the investigating officer's conjecture on the implication of the lack of any skid marks would not have been superior to a conclusion a jury could draw for themselves. Neither party alleged that the accident was a high speed collision. Both parties agreed that the driver's vehicle was at rest when it was struck. Fain testified that he was stopped about five feet behind the driver's pickup, and he estimated his speed at about five to six miles per hour at the time of the accident.[38] The passenger argued that Fain may have been going as fast as seven to eight

36. *Robinson v. Oklahoma Nephrology Assocs., Inc.*, 2007 OK 2, ¶ 6, 154 P.3d 1250; *B–Star, Inc. v. Polyone Corp.*, 2005 OK 8, ¶ 13, 114 P.3d 1082; *Dominion Bank of Middle Tenn. v. Masterson*, 1996 OK 99, ¶ 16, 928 P.2d 291.

37. *Fidelity & Cas. Co. of New York v. Hendrix*, 1968 OK 53, ¶ 10, 440 P.2d 735.

38. Testimony of Brady Fain, Jury Trial, February 1, 2006, Transcript p. 233 provides in pertinent part:

Q: How much distance was there between the front of your car and the back of the pickup?
A: ... Four or five.
...
Q: Give an estimate of how fast you were going.
A: Five or six miles an hour at the most.

miles per hour.[39]  Because there was no physical evidence by which the officer could calculate the vehicle's speed, there was no need for an expert witness to assist the jury in drawing an appropriate conclusion. Therefore, the trial court did not err by excluding the investigating officer's testimony and denying the insurer's motion for new trial.

## CONCLUSION

¶ 34 Through the Mediation Act, the Legislature has created a means by which parties may settle their disputes extra-judicially. The Mediation Act seeks to ensure that parties may openly negotiate in mediation without fear of reprisal in subsequent litigation by requiring all communications made during mediation to remain confidential. However, in order to sanction a party or attorney, a trial court must conform to the requirements of 12 O.S. Supp.2004 § 2011 or act within the scope of its inherent powers. The trial court did neither, and therefore, we reverse as erroneous the trial court's order sanctioning the passenger's counsel.

¶ 35 It is not bad faith for an insurer to seek judicial resolution of a legitimate dispute over a claim's validity or amount. The parties to this cause clearly had a legitimate dispute over the value of the UIM claim, and the passenger made no showing of any misconduct by the separate claims examiners. The trial court did not err by granting summary judgment on the issue of bad faith.

¶ 36 In order to testify on the speed of a vehicle involved in an accident, an investigating officer must have a mathematical means by which to calculate the speed. Here, the trial court did not abuse its discretion by excluding the testimony of the investigating officer when there was no physical evidence by which he could verify his estimate of the vehicles' speed at the time of the collision.

The trial court's decision is affirmed in part and reversed in part.

**CERTIORARI PREVIOUSLY GRANTED; TRIAL COURT AFFIRMED IN PART/REVERSED IN PART; COURT OF APPEALS OPINION VACATED.**

ALL JUSTICES CONCUR.

---

**39.** Testimony of Brady Fain, Jury Trial, see note 38, supra at p. 233 provides in pertinent part:

Q: ... But right here where I have highlighted (the report taken by the examiner), if you would like to take a look at it, it says you were going seven to eight miles per hour. Is that correct?

A: That's what it says, yes.

Q: Do you know how fast really that you were going?

A: I didn't read a gauge at the time, and I would say five to six still....