**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 2, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

JENNIFER HALTOM,

      Plaintiff-Appellant,

v.

GREAT NORTHWEST INSURANCE
COMPANY,

      Defendant-Appellee.

No. 10-6258
(D.Ct. No. 5:10-CV-00100-R)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MURPHY**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and
**GORSUCH**, Circuit Judge.
_____

Appellant Jennifer Haltom, who received injuries in a motor vehicle

accident, appeals the district court's grant of summary judgment in favor of her

insurance company, Appellee Great Northwest Insurance Company, in her action

against it for breach of implied covenant of good faith and fair dealing in

connection with her under-insured motorist policy. We exercise jurisdiction

pursuant to 28 U.S.C. § 1291 and affirm.

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, *res judicata* and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

## I. Factual and Procedural Background

The following material facts are undisputed and primarily contained in the district court's summary judgment order. At all times referenced hereafter, Mrs. Haltom, a resident of Oklahoma, maintained an insurance policy with Great Northwest, a corporation with its principal place of business in a state other than Oklahoma. Her policy provided different types of insurance coverage to Mrs. Haltom, including under-insured motorist coverage with a limit of $100,000 and medical payments with a limit of $10,000.

On April 18, 2008, Mrs. Haltom received physical injuries when a car driven by Bryan Pierson collided with her vehicle. During an emergency room visit immediately following her car accident, Mrs. Haltom complained of pain in her neck, upper back, left lower leg, left great toe, and right thumb, as well as soreness to her chest. She received treatment for cervical strain and thoracic strain as well as multiple contusions and was released several hours after her arrival at the emergency room. During her time at the emergency room, she made no complaints about her right knee and had no bruising, cuts, gashes, swelling, or pain in that knee.

Two or three weeks after the accident, Mrs. Haltom experienced pain for the first time in her right knee when she placed her body weight on it during a

yoga session. She sought medical attention for her right knee on May 13, 2008, and again on August 12, 2008. On August 13, 2008, Mrs. Haltom underwent Magnetic Resonance Imaging (MRI) on her right knee, which resulted in a finding of "no meniscal tear ... identified."

Thereafter, on October 9, 2008, an orthopedic surgeon, Dr. Larry Olsen, diagnosed Mrs. Haltom with a meniscal tear in her right knee and recommended surgical repair. During the exam, Mrs. Haltom told Dr. Olsen she believed the right knee injury occurred during the April 18, 2008 accident, although she later admitted this was merely a guess on her part. Based on her comment her knee injury occurred during the car accident, the exam document produced by Dr. Olsen, and later made available to Great Northwest, included the following notations: "Date of Injury: 4/08 MVA" and "HPI: Patient was involved in a motor vehicle accident in April 2008."

On November 7, 2008, Mrs. Haltom underwent successful arthroscopic surgery, at which time Dr. Olsen removed a torn portion of her meniscus.

On October 17, 2008, Mr. Pierson's liability insurance company, Traders Insurance Company, tendered his full policy coverage of $25,000 to Mrs. Haltom. Ten days later, on October 27, 2008, Mrs. Haltom's attorney sent a letter to

Michael Mayes, an independent local adjuster for Great Northwest, outlining her medical bills at $9,031.36; explaining future medical expenses relating to her upcoming knee surgery would exceed the $25,000 amount tendered by Mr. Pierson's insurance company; and asking whether Great Northwest would waive subrogation for the purpose of her accepting the $25,000 or, alternatively, substitute payment.

On November 26, 2008, Mrs. Haltom's attorney sent another letter to Mr. Mayes, explaining Mrs. Haltom's medical costs and expenses totaled $29,071.18 and again requesting information on whether Great Northwest would waive subrogation or substitute payment of the liability limits. In January 2009, Great Northwest provided Mrs. Haltom with $10,000 – the limit under her medical benefits policy to cover medical expenses incurred in the car accident.

On February 3, 2009, Mrs. Haltom's attorney sent Dean Chavez, a senior claims adjuster for Great Northwest, a letter: (1) explaining her medical expenses totaled $29,516.12, together with gross lost wages of $1,498.25; (2) inquiring whether Great Northwest would waive subrogation or substitute payment; and (3) requesting immediate payment under her under-insured motorist policy. A copy of her corresponding medical records accompanied the letter. On March 3, 2009, Mr. Chavez sent a letter agreeing to waive subrogation rights with regard to any

and all medical payments issued on behalf of Mrs. Haltom from Mr. Pierson's insurance company and stating "we can discuss her under-insured motorist claim in the near future."

Mr. Chavez reviewed the medical records Mrs. Haltom's counsel furnished, which, together with her delay in her complaints and treatment relating to her right knee following the accident, caused him to believe Mrs. Haltom's torn meniscus was unrelated to her car accident and that her receipt of payments, including the $25,000 from Traders Insurance Company and $10,000 from Great Northwest under her medical payments policy, covered more than what her claim was worth. His decision took into account Mr. Mayes's assessment that the injury to Mrs. Haltom's right knee "might be questionable," even though Mr. Mayes also suggested offering her $60,000 to settle her claim and authority to negotiate up to $90,000 to settle her claim. However, regardless of what Mr. Mayes valued her claim at, it was ultimately Mr. Chavez's responsibility to determine if Mrs. Haltom had coverage with regard to causation.

Thereafter, on May 20, 2009, Mr. Chavez sent a letter to Mrs. Haltom's attorney, stating:

> The concern I have is that in the initial records from the day of the accident ... there is no mention of the right knee. None of the records address it and there were no x-rays taken, it appeared to be a

non-issue.  Although the MRI done 4 months later on 8/13/2008 did note Chondromalicia of the patella, it went on to say there was NO meniscal tear identified.  Our concern is whether or not this is related to the accident?  What trauma and or activities could have occurred to the knee between the time of the accident and the surgery in November?

In his letter, Mr. Chavez also requested more documentation on Mrs. Haltom's "past medical history, activities, work history, etc." and extended an offer of $5,000 to Mrs. Haltom in an effort to resolve her claim and avoid "potential litigation expenses."

Mrs. Haltom declined the $5,000 settlement offer, and on September 15, 2009, through her attorney, filed an action against Great Northwest for breach of implied covenant of good faith and fair dealing, claiming it failed to evaluate her claim, make any attempts to resolve the claim, and forced her to file the current action to resolve her claim.  In filing her action, Mrs. Haltom sought both compensatory and punitive damages and requested in excess of $10,000 for "costs, attorney's fees and any other relief" deemed appropriate.[1]

During discovery, the parties took the depositions of various individuals, including Mrs. Haltom, Mr. Chavez, and Dr. Olsen.  In his deposition, Dr. Olsen

---

[1]  Mrs. Haltom initially filed her complaint in the District Court of Oklahoma County, after which removal to the United States District Court for the Western District of Oklahoma occurred.

-6-

admitted he based his initial notes, suggesting Mrs. Haltom's knee injury occurred in the April 2008 car accident, solely on the information she provided him. He also agreed that if the meniscus tear had been caused due to blunt trauma from the accident, it would be unusual not to have pain or soreness in the knee at that time and not to see any physical evidence of trauma such as bruising, swelling, or abrasions. Dr. Olsen admitted a reasonable doubt existed as to causation, and he could not say with any degree of medical certainty the car accident caused the tear after learning Mrs. Haltom's knee showed no physical evidence of trauma after the accident, she merely speculated the injury occurred from the car accident, and she admitted the pain did not occur until weeks later while in a yoga session.

Following discovery, Great Northwest filed a motion for summary judgment and a brief in support thereof, claiming it did not act in bad faith because a legitimate dispute existed regarding the causation of Mrs. Haltom's right knee injury and her right to coverage under the policy. In support, it relied in part on the deposition of Dr. Olsen and offered the opinion of an orthopedic surgeon, Dr. Foster, who reviewed Mrs. Haltom's medical records and also found a reasonable doubt existed as to the causation of the meniscal tear.

In addition, Great Northwest argued it did not act in bad faith for failing to timely reply to Mrs. Haltom's attorney's inquiries regarding subrogation. Instead, it pointed out Oklahoma Statute title 36, § 3636(F) gave Great Northwest sixty days from Mrs. Haltom's claim in her October 27, 2008 letter, or until December 27, 2008, to either waive subrogation or substitute payment and that failure to respond within that time frame constituted a statutory waiver, giving her the right to Mr. Pierson's policy limits. As a result, it explained, she could have cashed the $25,000 check from Traders Insurance Company at that time.

Following Mrs. Haltom's response to the motion for summary judgment and Great Northwest's reply thereto, the district court issued an order on the motion for summary judgment. It determined a legitimate dispute existed as to whether Mrs. Haltom's car accident caused the torn meniscus in her right knee. In making this determination, it found Great Northwest's denial of coverage was reasonable and legitimate as a matter of law, given: (1) the absence of any complaints about her knee following the accident; (2) the fact her knee pain did not develop until two or three weeks after the accident when she placed body weight on it during yoga; (3) her delay in seeking medical attention and treatment; and (4) the fact the MRI revealed "no meniscal tear."

It also rejected Mrs. Haltom's claim Great Northwest failed to adequately investigate her claim, noting Mr. Chavez reviewed all of her medical records at the time he questioned the cause of her knee injury and that she failed to show any material facts were overlooked or intentionally disregarded or that a more thorough investigation would have produced relevant information. Similarly, it rejected Mrs. Haltom's argument Great Northwest should have asked her physician, Dr. Olsen, to re-examine her, further explain his findings, or have her examined by other physicians, noting that even her physician admitted he could not say with any degree of medical certainty the car accident in fact caused the meniscal tear in her right knee.

Next, the district court rejected Mrs. Haltom's contention Great Northwest acted in bad faith by offering only $5,000 when Mr. Mayes valued her claim at up to $90,000. It noted both Mr. Chavez and Mr. Mayes questioned whether the car accident caused Mrs. Haltom's knee injury, and Great Northwest was not bound by Mr. Mayes's recommended offer of $60,000 to $90,000 to settle. Instead, it explained, even if this indicated the value Mr. Mayes assigned to the claim, the issue centered on whether Mrs. Haltom even had "coverage" under her insurance policy and that Mr. Chavez, not Mr. Mayes, had the responsibility, as the in-house adjuster, for making final determinations as to such coverage.

Finally, the district court determined Great Northwest did not act in bad faith in failing to timely respond to Mrs. Haltom's request as to whether it would either waive its subrogation rights or substitute payment for the $25,000 tendered by Mr. Pierson's insurance company. It determined that as a matter of law, pursuant to Oklahoma Statute title 36, § 3636, Great Northwest waived its right to subrogation when it failed, by December 27, 2008, to respond. It further determined waiver of subrogation rights at the end of the statutory period by operation of law cannot constitute bad faith, and, alternatively, Mrs. Haltom's failure to respond to Great Northwest's argument on this point constituted her own forfeiture or waiver of the issue. For these reasons, the district court granted Great Northwest's motion for summary judgment.

## II. Discussion

On appeal, Mrs. Haltom contends the district court erred in granting summary judgment to Great Northwest. In support, she claims it made five legal errors in: (1) failing to consider the report of her expert witness, Mr. Mort Welch, an attorney who reviewed her medical records and Great Northwest's claim file and concluded Great Northwest violated industry standards and committed bad faith; (2) concluding Great Northwest legitimately disputed causation based solely on the fact her right knee injury did not manifest itself until two or three weeks after the car accident, her delay in seeking medical treatment, and the fact the

MRI did not show a meniscus tear; (3) improperly considering post-hoc evidence acquired by Great Northwest after it denied her claim, which included the deposition of Dr. Olsen and the opinion of Dr. Foster; (4) failing to follow Oklahoma law in disregarding the recommendation of the independent adjuster, Mr. Mayes, that her claim was worth $60,000 to $90,000; and (5) incorrectly characterizing her allegation that Great Northwest drew improper inferences from the medical records as an assertion its "investigation was inadequate." She also cites numerous Oklahoma cases in support of her appeal and suggests the district court relied on two inapposite cases in rendering its order.

In making her appellate arguments, Mrs. Haltom does not raise a claim, as she did in her complaint, that Great Northwest committed bad faith by its delay in responding to her inquiry on subrogation, and, therefore, she has forfeited such a claim on appeal.[2]  *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007).

In addressing the issues Mrs. Haltom did raise on appeal, we consider our standard of review and the applicable legal principles. "We review the grant of

___

[2]  As previously noted, the district court similarly determined Mrs. Haltom forfeited such an issue by failing to raise it in her response to Great Northwest's argument.  By failing to appeal this issue, we need not address either the district court's determination of such forfeiture or its alternative conclusion that, as a matter of law, pursuant to Oklahoma Statute title 36, § 3636, waiver of subrogation rights at the end of the statutory period by operation of law cannot constitute bad faith.

summary judgment de novo, applying the same standard as the district court pursuant to Rule 56(c) of the Federal Rules of Civil Procedure." *Reid v. Geico Gen. Ins. Co.*, 499 F.3d 1163, 1167 (10th Cir. 2007) (quotation marks omitted). Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In diversity cases, the laws of the forum state govern our analysis of the underlying claims, while federal law determines the propriety of the district court's grant of summary judgment. *See Reid*, 499 F.3d at 1167; *Hill v. Allstate Ins. Co.*, 479 F.3d 735, 739 (10th Cir. 2007). "When the federal courts are called upon to interpret state law, [we] must look to the rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule" by considering the rulings of that state's intermediate courts. *Johnson v. Riddle*, 305 F.3d 1107, 1118-19 (10th Cir. 2002).

We begin with Mrs. Haltom's claim the district court erred by failing to consider Mr. Welch's legal expert opinion in its summary judgment ruling. As Great Northwest contends, Mrs. Haltom did not offer this opinion nor did she otherwise mention it in support of her response to its summary judgment motion. Arguably, Mrs. Haltom waived its consideration by the district court when she failed to raise it in her response to the motion for summary judgment. *See*

-12-

*Employers Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1176 n.20 (10th Cir. 2010) (relying on *Cummings v. Norton*, 393 F.3d 1186, 1190 (10th Cir. 2005) (stating "issues not raised below are waived on appeal")). Nevertheless, Great Northwest admits it attached the Welch opinion to its reply to Mrs. Haltom's response to its motion for summary judgment. As a result, the district court had the report before it, and it is in the record before us. Although the district court did not expressly mention the report in its order on summary judgment, it does not mean it failed to consider it or any other documents submitted in support or opposition to summary judgment, and Mrs. Haltom has not provided any evidence to support her assertion it failed to consider the report. Instead, we presume, by failing to mention or otherwise rely on the report, the district court found it unpersuasive in the disposition of the issues before it, as do we. This is because the legal opinion focuses primarily on the subrogation and delay issues which have been waived on appeal. To the extent it discusses the knee injury, it does so merely in the context of stating a further investigation was warranted in which Great Northwest should have acquired additional information, including information from Mrs. Haltom's physician or other physicians, but it does not provide any meaningful discussion on actual causation, including the fact she experienced no visible physical trauma to the knee at the time of the accident and no pain until weeks after it. Finally, the undisputed facts contained in the record on appeal, as well as the applicable principles of law, overwhelmingly indicate a

-13-

lack of bad faith by Great Northwest, and we will not substitute a differing legal opinion for the province of the courts and our legal decision-making authority.

Having resolved this issue, we turn to the primary issue before us – whether a question existed as to the cause of Mrs. Haltom's knee injury for the purpose of denying under-insured motorist coverage, and thus, whether Great Northwest acted in bad faith in questioning or denying such coverage. "Before the issue of an insurer's alleged bad faith may be submitted to the jury, the trial court must first determine as a matter of law, under the facts most favorably construed against the insurer, whether the insurer's conduct may be reasonably perceived as tortious." *Garnett v. Gov't Employees Ins. Co.*, 186 P.3d 935, 944 (Okla. 2008). In order to establish a breach of the duty of good faith and fair dealing under Oklahoma law, the insured must show: (1) *she was covered under the liability insurance policy*; (2) the insurance company's actions were unreasonable under the circumstances; (3) it failed to deal fairly and in good faith toward her; and (4) the breach of duty was the direct or proximate cause of damage to her. *See Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1093 (Okla. 2005).

While an insurer has an implied-in-law duty to act in good faith and deal fairly to make certain the insured received any *covered* policy benefits, *see Christian v. Am. Home Assur. Co.*, 577 P.2d 899, 901 (Okla. 1977), it is clear

-14-

under Oklahoma law that an insurer also does not breach its duty of good faith and fair dealing by refusing to pay a claim or by litigating with its insured where a legitimate and reasonable dispute exists as to coverage or the amount of the claim. *See Gov't Employees Ins. Co. v. Quine*, 264 P.3d 1245, 1249 (Okla. 2011); *Brown v. Patel*, 157 P.3d 117, 129 (Okla. 2007); *Buzzard v. Farmers Ins. Co.*, 824 P.2d 1105, 1109 (Okla. 1991). In this regard, "Oklahoma law recognizes that there may be disputes between insurer and insured regarding a variety of matters, including coverage, cause and amount of loss, and breach of policy conditions." *Pitts v. W. Am. Ins. Co.*, 212 P.3d 1237, 1240 (Okla. Civ. App. 2009). In determining whether an insurance company acted unreasonably and in bad faith, Oklahoma courts look to whether the insurer, at the time payment or performance is requested, had a good faith belief that a justifiable reason existed for withholding the requested payment or performance under the policy. *See Brown v. Oklahoma Farm Bureau Mut. Ins. Co.*, 261 P.3d 622, 626-27 (Okla. Civ. App. 2011) (relying on *Newport v. USAA*, 11 P.3d 190, 195 (Okla. 2000); *Conti v. Republic Underwriters Ins. Co.*, 782 P.2d 1357, 1362 (Okla. 1989); *Buzzard v. McDanel*, 736 P.2d 157, 159 (Okla. 1987)). Thus, whether an insurer breaches its duty of good faith and fair dealing is dependent on the particular facts and circumstances in each case. *See Quine*, 264 P.3d at 1249.

Applying these principles and our de novo review, we agree with the district court that the undisputed facts establish a legitimate and reasonable dispute existed, at all times in question, as to whether Mrs. Haltom's car accident caused her knee injury. As the district court explained, it was reasonable for Great Northwest to question whether her knee injury was covered by her under-insured motorist policy based on the medical records and other information she furnished. As it explained, this information revealed an absence of any complaints about her knee following the accident, established her knee pain did not develop until she participated in yoga two or three weeks after the accident, and showed she delayed seeking medical attention and treatment. It also noted Mr. Chavez had a legitimate reason to question the timing of the meniscus tear given the August 2008 MRI showed no tear, but her surgeon discovered a tear during the November 2008 surgery. In other words, it was not unreasonable for Mr. Chavez to question what further activities Mrs. Haltom may have engaged in during that period for the purpose of determining what else could have caused the tear.

We further note that none of the emergency room medical records Mrs. Haltom furnished to Great Northwest noted any bruises, swelling, contusions, or abrasions on her knee for the purpose of causally connecting her car accident with her later knee problem. Only Dr. Olsen's rudimentary notations of "MVA" and

-16-

"Patient was involved in a motor vehicle accident in April 2008" on his initial exam document implied a causal connection between her knee and the accident. Great Northwest's questioning of these general and cursory notations in light of the overwhelming, contradictory evidence that her injury did not stem from the accident does not evidence bad faith conduct.

Moreover, it is apparent Great Northwest and the district court relied on Dr. Olsen's testimony and the opinion of Great Northwest's expert, Dr. Foster, for the purpose of establishing Great Northwest had a legitimate, good faith reason to question Dr. Olsen's cursory notations and causation of the knee injury *at the time it denied coverage*. In other words, both doctors considered the same medical and other information available to, and considered by, Mr. Chavez at the time he questioned Mrs. Haltom's coverage and came to the same conclusion that a reasonable doubt existed at the time in question as to the cause of the meniscal tear. This evidence was not a substitute for Mr. Chavez's coverage determination, but merely lent credence to it. Thus, we reject Mrs. Haltom's contention the district court inappropriately relied on their testimony. Instead, under the particular facts and circumstances presented, Great Northwest has shown it had a reasonable, good faith belief a justifiable reason existed to deny coverage and withhold the requested payment. As a result, we agree with the district court's conclusion Great Northwest's denial of coverage, and offer of

$5,000 to settle the matter without litigation, was reasonable and legitimate as a matter of law.

Having concluded Great Northwest had a legitimate reason to deny coverage, we reject Mrs. Haltom's claim the district court failed to follow Oklahoma law in disregarding the recommendation of Mr. Mayes, the independent adjuster, that her claim was worth between $60,000 and $90,000. As Mrs. Haltom contends, Oklahoma law suggests an insurer commits bad faith if it fails to promptly settle a claim for the value, or within the range of value, assigned to the claim. *See Newport*, 11 P.3d at 196. However, as the district court attempted to explain, the value of Mrs. Haltom's claim is secondary in this case because a preliminary question existed as to whether she even had coverage under her under-insured motorist policy based on the causation issue. In other words, it is not bad faith to fail to settle a claim for the value assigned if it is questionable whether coverage even exists in the first place.

Next, we address Mrs. Haltom's argument the district court incorrectly mis-characterized her allegation Great Northwest drew improper inferences from the evidence as an allegation that its "investigation was inadequate." She makes this argument while also admitting she suggested Great Northwest could have obtained additional information and that if it had doubts about Mr. Mayes's

evaluation of her claim, it could have reviewed additional medical records, sought a further explanation from her treating physician, or requested an independent medical examination. These issues are the *very ones* the district court addressed when it: (1) noted Mr. Chavez reviewed all of her medical records at the time he questioned the cause of her knee injury; (2) concluded Mrs. Haltom failed to show any material facts were overlooked or intentionally disregarded or that a more thorough investigation would have produced relevant information; (3) rejected her argument Great Northwest should have asked her physician, Dr. Olsen, to re-examine her or further explain his findings or have her examined by other physicians; and (4) explained the issue with regard to Great Northwest's investigation into her medical records was not the valuation of her claim, but whether coverage even existed. Because the district court expressly addressed the issues Mrs. Haltom raised, it is immaterial whether it correctly characterized them as an allegation that Great Northwest failed to draw the proper inferences from the evidence presented or failed to adequately investigate. In other words, to use an illustrative idiom, Mrs. Haltom's argument simply "splits hairs," concentrating on an immaterial distinction which does not warrant reversal of the district court's summary judgment in favor of Great Northwest.

Mrs. Haltom also claims the district court relied on two inapposite cases, *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1436 (10th Cir. 1993), and

*Thompson v. Shelter Mut. Ins.*, 875 F.2d 1460, 1462 (10th Cir. 1989), in rendering its order, pointing out they are not factually similar to her case. However, we note the district court merely relied on these cases for a general proposition of law and not for their factual similarity to the case at hand. Specifically, it relied on them for the proposition that "if there is a legitimate dispute as to coverage or the amount of the claim, and the insurer's position is reasonable and legitimate, the insurer does not breach the duty of good faith by refusing to pay a claim or by litigating with its insured." *See Oulds*, 6 F.3d at 1436. This directly parallels Oklahoma law on the same subject. *See Quine*, 264 P.3d at 1249 (holding an insurer does not commit bad faith by refusing to pay a claim if a legitimate and reasonable dispute exists as to coverage or the amount of the claim); *Brown v. Patel*, 157 P.3d at 129 (same); *Buzzard v. Farmers*, 824 P.2d at 1109 (same). We further note that, like the district court, Mrs. Haltom relies on *Oulds* in her appellate brief for general propositions of insurance law, despite her argument it is factually dissimilar to her case. Finally, the many cases cited by Mrs. Haltom in support of her appeal similarly provide general propositions relating to insurance law but do not, under the circumstances presented here, establish Great Northwest acted in bad faith.

### III. Conclusion

For these reasons, we **AFFIRM** the district court's grant of summary judgment in favor of Great Northwest.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge