AKINS v. BEN MILAM HEAT AIR & ELECTRIC INC.



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:AKINS v. BEN MILAM HEAT AIR & ELECTRIC INC.

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 AKINS v. BEN MILAM HEAT AIR & ELECTRIC INC.
2019 OK CIV APP 52
Case Number: 114935
Decided: 01/11/2019
Mandate Issued: 10/16/2019
DIVISION III
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION III
Cite as: 2019 OK CIV APP 52, __ P.3d __

 

KACY AKINS, INDIVIDUALLY, AND VELVA AKINS, INDIVIDUALLY AND AS NEXT FRIEND OF D.N., A MINOR, Plaintiffs/Appellants,
v.
BEN MILAM HEAT, AIR & ELECTRIC, INC., Defendant/Appellee.

APPEAL FROM THE DISTRICT COURT OF
GRADY COUNTY, OKLAHOMA

HONORABLE W. MIKE WARREN, TRIAL JUDGE

REVERSED AND REMANDED

A. Laurie Koller, CARR & CARR, Tulsa, Oklahoma, and
Tye H. Smith, CARR & CARR, Oklahoma City, Oklahoma, for Plaintiffs/Appellants,

Nathan E. Clark, Rachel M. Rogers, RHODES, HIERONYMUS, JONES, TUCKER & GABLE, P.L.L.C., Tulsa, Oklahoma, for Defendant/Appellee.

Barbara G. Swinton, Presiding Judge:

¶1 Plaintiffs Kacy Akins, his former wife, Velva Akins now Phillips, and her son, D.N. (collectively, Plaintiffs), appeal a judgment based on a jury verdict in favor of Defendant Milam Heat, Air & Electric Inc. (Milam). Plaintiffs' cause of action for negligence sought damages for carbon monoxide (CO) poisoning allegedly caused by Milam's failure to properly and safely maintain, inspect, and/or warn of a hidden dangerous condition existing in the gas furnace in their home. We conclude the trial court abused its discretion by determining Plaintiffs breached their duty to preserve evidence by removing their gas furnace and its ventpipe or "flue" and lastly by sanctioning them in giving an adverse inference instruction to the jury. This record shows a complete absence of evidence of pre-litigation conduct which was in bad faith, willful or intentional. The admission of irrelevant evidence concerning the spoliation circumstances improperly made that issue the focus of the trial instead of the merits, and prejudiced Plaintiffs' right to a fair trial. The judgment in favor of Milam is reversed, and a new trial is granted.

UNDISPUTED FACTS

¶2 Milam is a business in Chickasha, Oklahoma, in Grady County. On October 26, 2007, Milam's heat and air technician, Andy Adkins, went to Plaintiffs' home in Chickasha for a "no heat" service call. Adkins cleaned rust from the gas furnace's burners and replaced burned wires. After cycling the furnace several times, he told Mrs. Akins the furnace was operating okay and gave her a repair invoice.

¶3 Just before midnight November 6, 2007, Mr. Akins was awakened before midnight by a loud noise. He got up and found Mrs. Akins on the bathroom floor, passed out with a bloody face. Mr. Akins screamed for his stepson, D.N., who did not respond. Mr. Akins called an ambulance, Mrs. Akins was transported to the local emergency room, and Mr. Akins drove himself there. While waiting in the lobby, Mr. Akins passed out, was evaluated, and admitted to the hospital.

¶4 During treatment Mrs. Akins inquired about D.N., then 17 years of age. Soon after, her relatives found D.N. in his bedroom and were dragging him outside when Chickasha Police Officer T. Breath, who had been dispatched to the scene, arrived to help. D.N. was transported by ambulance to the hospital.

¶5 Additionally, on November 6, 2007, the local firemen at the scene ran a CO test inside the house with a meter that starts to alert at "35." According to Officer Breath, the CO meter read "1100 (Incident Level)." The firemen told Officer Breath not to go back into the residence, turned off Plaintiffs' gas furnace, and opened the windows to clear the air. Officer Breath called the police dispatcher, who then called the home of Ivan Reed, a local heat and air technician for Milam, woke him up, asked for his help and then gave him the address. Mr. Reed arrived between 1-2 a.m. using his flashlight in the dark house to locate the gas fueled furnace in a laundry room closet.

¶6 Mr. Reed checked the furnace burner, cleaned off some rust, inspected the heat exchanger for cracks "as best he could," but did not see any. He also looked up the furnace vent or "flue" and did not see any black soot. He then got his ladder, climbed up on the roof, and used his flashlight to see if the flue was obstructed "with a bird nest or something else" that would prevent CO and other gases from properly venting outside.

¶7 Mr. Reed then asked the firemen to run another test for CO, and they observed the levels in the house begin to rise after he started the furnace. Officer Breath testified Mr. Reed stated, "I don't know what's going on, but I disabled the unit so it won't -- you can't turn it back on." Mr. Reed then asked the police officer to tell the homeowners to call Milam "first thing in the morning so that they could discuss the way they are going to fix this."

¶8 Testing revealed each family member had elevated carboxyhemoglobin levels in their blood confirming carbon monoxide (CO) poisoning. They all were treated with supplemental oxygen, Mrs. Akins and D.N. were released after their oxygen levels normalized, and Mr. Akins was kept for observation. The following timeline demonstrates the events after his release from the hospital:

Nov. 8, 2007 - Mr. Akins arrived home from the hospital and called two local HVAC companies. Meli H&A looked at the furnace and submitted a quote for new gas furnace.

Nov. 9, 2007 - Mr. Akins met with Albright H&A about need for replacing furnace.

Nov. 12, 2007 - Mr. Akins received Meli H&A's proposal for new electric furnace.

On or before Nov. 13, 2007 - Mr. Akins retained Carr & Carr (Law Firm)

Nov. 13, 2007 - Law Firm wrote letter to Milam, advising they were retained by the Akins family "concerning the CO poisoning they sustained after the work Milam had performed on their heating unit".

Nov. 19, 2007 - Mr. Akins accepted Albright H&A's proposal to replace gas furnace with new electric heat pump; order was placed.

Nov. 26, 2007 - Milam's Insurer, Hanover Ins. Grp, responded to Law Firm; requested: 1) the family's authorization for medical records, 2) clarification of date of loss; 3) "records pertaining to the care and maintenance of the furnace, names of manufacturer, initial installer and any other companies who may have done work on the furnace"; 4) "to inspect this furnace at your earliest convenience"; and also 5) "if repairs have been done we will need the name and contact information of the company doing such repairs." Insurer finally asked to take the Akins family's statements, advising of its willingness to get statements "after the holidays" but asking for "the inspection of the furnace to take place as soon as practicable, to avoid any spoliation issues."

Dec. 3, 2007 - New electric heat pump installed approximately two weeks after Mr. Akins accepted bid (see November 19, 2007); the installers carried the furnace to his waterproof backyard shed where it was covered and stored; flue/vent pipe to furnace apparently discarded.

On or about Jan. 7, 2008 - Mr. Akins testified he and his brother-in-law removed the original gas water heater about two months after CO incident, replaced with an electric one, and carried the gas water heater to the curb for pickup. The furnace and water heater were housed in the same utility closet.

Jan. 22, 2008 - Milam and Insurer's expert went to the Akins' home to inspect the furnace.

Jan. 24, 2008 - Insurer's letter to Law Firm, insisting on completing the inspection of the Akins' furnace alleged to be leaking CO. Noted "upon arrival at your client's home on [1-22-2008], our expert and insured found the original furnace which is the subject of this action had been removed from the utility closet."

Dec. 17, 2008 - Furnace removed from the Akins' shed for testing requested by Insurer; Milam chose location at DeHart Heat & Air; Plaintiffs' truck was too small to transport furnace in an upright position and requested Milam transport to DeHart; test attended by Dr. Block and Insurer's expert was to determine if the furnace produced excessive CO under optimal conditions; CO test result 2000 parts per million (ppm) (testing level). Later inquiry to DeHart revealed the furnace was lost.[1]

 

Litigation History

 

¶9 On April 19, 2009, Plaintiffs filed their petition against Milam, alleging negligent failure to properly and safely maintain, inspect, and/or warn of a hidden dangerous condition of the furnace in their home. They further alleged Milam "held itself out to be a professional in the field of residential heating installation and maintenance."

¶10 Milam filed its answer on May 28, 2009, admitting "it was in the business of providing heating installation and maintenance" but specifically denied Plaintiffs' allegations of negligence. As affirmative defenses, Milam asserted contributory negligence, actions by third parties over which it had no control, and any defect that existed was open and obvious. It denied the existence of an unreasonably hazardous condition and that it had notice of a defect.

¶11 Over the next 3-1/2 years, the trial court approved the parties' nine joint applications to extend the pretrial schedule. In January 2013, Milam moved for "Judicial Determination Of Its Entitlement To An Adverse Inference Jury Instruction Based On Plaintiffs' Willful Destruction Of Evidence." Noting Plaintiffs' alleged theories for the furnace's production of toxic CO, "inadequate combustion air supply in the closet and cracked furnace heat exchanger," Milam argued it had been substantially prejudiced because it was unable to fully defend against their case because Plaintiffs had "willfully" removed the furnace from the utility closet, without notice to Milam.

¶12 Plaintiffs responded, denying any destruction of evidence and arguing the factors for spoliation sanctions were not present. They also argued Milam's authority for "spoliation" of the furnace from the closet in which it operated was distinguishable. Milam replied, arguing Barnett v. Simmons, 2008 OK 100, 197 P.3d 12, controlled the issue of spoliation. The trial court denied Milam's sanction motion, holding the issues would be "ruled on ... after the evidence is heard at trial."

¶13 Two years later, on April 2, 2015, the original trial judge recused himself from the case for reasons not disclosed by the record. Eighteen days later, a second judge was assigned to the case.

¶14 In June of 2015, Plaintiffs moved to transfer the trial to another county pursuant to 12 O.S. 140,[2] arguing the marital relationship between the Milam's owner, Royce Hannah, and the Court Clerk for Grady County, Lisa Hannah, and also her position as secretary/treasurer of Milam, raised concerns with Plaintiffs' ability to get a fair and impartial jury trial. Milam opposed Plaintiffs' motion to transfer, which the trial court subsequently denied.

¶15 On November 24, 2015, Milam moved for reconsideration of its sanction motion for an adverse inference jury instruction for Plaintiffs' spoliation of evidence. Plaintiffs objected that there was no new evidence or arguments and incorporated by reference their response to Milam's first sanction motion. They specifically requested a spoliation instruction against Milam, attaching evidentiary support for its possession and control of the furnace when it was permanently lost.

¶16 A hearing was held December 16, 2015, on the parties' numerous motions in limine and counter-motions for sanctions.[3] Concerning the latter, the order filed January 25, 2016, states the trial court reviewed "all of the related pleadings,"[4] heard "all arguments," and reserved its ruling "until ... determination during the trial process."

Summary of the Jury Trial

¶17 During the five-day jury trial, January 25-29, 2016, the jury heard nine witnesses in Plaintiffs' case in chief premised on Milam's failure to properly service their gas furnace, specifically: 1) failure to perform a CO test, and 2) failure to warn Plaintiffs of the potential danger obvious to Milam at the October 26, 2007 service call.[5] To support their first theory of liability, expert testimony revealed several national associations/groups recommend testing for CO, but there are no Oklahoma or federal statutes or agency regulations requiring it. All experts agree the National Field Code sets a 400 ppm limit on the quantity of CO to safely exit the furnace's flue, and that value cannot be safely exceeded.[6] Plaintiffs' expert, Dr. Block, testified there were clear indications for the CO testing in this case: 1) the burned wires caused by flame-roll out; and 2) the installation in a closet without venting to provide an adequate combustion air supply did not meet current code requirements for safety from CO poisoning. Dr. Block testified a CO test takes less then 10-20 minutes and it alone would have determined the presence of excessive CO regardless of which two gas appliances in the closet was the source.

¶18 During Plaintiffs' case in chief, Milam's technician, Mr. Adkins, testified Milam had no set policy for CO testing, but as a technician he did, so if he had any concerns or the customers mentioned any symptoms of CO poisoning, he would drive to the shop to pick up a CO detector and return to test for CO. He testified Plaintiffs had an old "gravity-style" furnace,[7] that he cleaned the rust from the burner and heat exchanger and fixed the burned wires caused by "flame roll-out."[8] After turning on the furnace, he cycled through its settings and verified it was working properly by checking to make sure the burner flame had a steady, blue flame. He admitted "flame roll-out" may indicate the furnace is producing excessive CO caused by one of three problems: 1) an obstructed furnace vent (a/k/a "flue"), 2) inadequate combustion air supply, or 3) a cracked heat exchanger.

¶19 Plaintiffs' experts testified a heat exchanger in a furnace must be removed to properly check for holes or cracks from which CO and other combustion products would leak. Both experts testified that the heat exchanger in the GE brand and model furnace in the Akins' home always cracked in the back. Both experts agreed it was better to test the furnace in original condition. However, they opined such condition was less significant in this case because the furnace 1) had been tested in its original condition by the fireman and Mr. Reed the night of the CO poisoning when it produced the toxic CO level of 1100 ppm (incident level), then was tagged out of service, obstruction of the flue was eliminated the same night and 2) had been stored and subsequent tests with optimal supply of combustion air revealed the furnace still produced toxic CO levels. Both experts opined a cracked heat exchanger was the source of the furnace's excessive production of CO.

¶20 For Plaintiffs' failure to warn theory, there was witness testimony and an exhibit of the invoices from Milam for its two prior service calls for burned wires caused by flame roll-out. Mr. Adkins testified he was not told about Milam's prior service calls at the Akins' home. The 11-01-06 invoice notes the "Unit should have combustion air installed" which, according to Plaintiffs' exhibit of Dr. Blocks' summary of findings, documents Milam's knowledge that the furnace presented the danger of CO poisoning more than a year before the incident that did poison them. It is undisputed that the significance of the 11-01-06 recommendation to install combustion air was not explained to Mrs. Akins on that date. Mr. Adkins admitted he noticed the furnace had been improperly installed in a closet with no outside source of combustion air, that its blower safety switch had been bypassed, and that he did not mention either problem to Plaintiffs.

¶21 Mr. Adkins testified he checked the flame condition to make sure it was blue and steady with the doors wide open because it was physically impossible for him to be inside with the door shut. According to Plaintiffs' experts, Mr. Adkins failed to properly evaluate the furnace's burner flame by checking its condition with the utility closet doors open, which failed to test for a possible cause of the flame roll-out, i.e., inadequate combustion air supply due to the furnace's installation in the unvented closet.

¶22 The trial court denied Milam's motion for directed verdicts as to negligence and res ipsa loquitor, but directed a verdict on Plaintiffs' claim for punitive damages. Milam proceeded with its defense that Plaintiffs could not prove a specific cause for the CO production because Plaintiffs destroyed the furnace in its original condition including the gas hot water heater. Their case in chief included three expert witnesses, two for damages and one HVAC expert, L. Wilhelm.

¶23 Wilhelm opined that neither he nor anyone else with experience could determine the specific source for the CO at the Plaintiffs' home "without seeing the scene as it was when this happened." He testified that if a H&A technician sees a mainly blue flame and no fluttering, there is no reason to check for carbon monoxide or to inspect for a cracked heat exchanger.

¶24 Wilhelm further opined it was important to check the original condition of the flue "because if something has happened... for example, if birds built a nest in it or something." Wilhelm also testified it did not surprise him "Dr. Block was unable to reach a specific determination as to what was causing the furnace to function the way it was" because "the scene was destroyed."

¶25 The parties' exhibits, some pre-admitted by stipulation and the rest admitted throughout the trial, were voluminous. The jury instructions included Defendant's requested adverse inference instruction.[9] The jury returned a unanimous verdict on all issues in favor of Milam on March 29, 2016. Plaintiffs appeal the Journal Entry of Judgment filed March 30, 2016, in which the trial court entered judgment in favor of Milam and against the Plaintiffs.

GENERAL ERRORS AND STANDARD OF REVIEW

¶26 Plaintiffs allege the trial court erred in refusing and giving certain jury instructions, admitting and excluding evidence, and denying their pre-trial motion to transfer the case to a different venue. In reviewing assigned error in jury instructions, "this court must consider the instructions as a whole, to determine whether [they] reflect the Oklahoma law on the relevant issue." Nealis v. Baird, 1999 OK 98, ¶ 15, 996 P.2d 438, 444-445. A judgment will not be disturbed on appeal unless it appears reasonably evident that the jury was misled by the allegedly erroneous instruction. Id. By statute, an appellate court may not disturb a judgment for misdirection of the jury in the absence of a miscarriage of justice or a substantial violation of the complaining party's constitutional or statutory rights. Id. "The test upon review of an instruction urged as improperly given or refused is whether there is a probability that the jury was misled into reaching a result different from that which would have been reached but for the error." Id. With these principles in mind, we begin with Plaintiffs' jury instruction arguments.

ANALYSIS

Jury Instructions

Adverse Inference

¶27 Plaintiffs challenge the court's decision that they failed to preserve material evidence and the sanction of giving the jury an adverse inference instruction. They specifically argue: 1) there was no evidence that Plaintiffs destroyed anything willfully or intentionally; 2) they had a reasonable explanation for removing the furnace; 3) the furnace was stored in a shed, made available to Milam's expert for testing, and lost during Milam's possession and control; and 4) the trial court's stated reason for not giving the same sanction against Milam is contrary to the record. In separate propositions but related to the same issue, Plaintiffs also challenge the trial court's refusal to give an adverse inference against Milam for its spoliation of the evidence, arguing it is contrary to the evidence presented to the jury.[10]

¶28 Milam argues the trial court correctly found Plaintiffs' failure to preserve "the furnace in the condition it was operating the night of the incident" rose to the level of spoliation as defined by Oklahoma law. Milam claims the adverse inference instruction given to the jury is the "least intrusive and most appropriate" sanction because Plaintiffs' willful removal of the furnace without notice prejudiced Milam by making it unable to fully defend against Plaintiffs' theories of liability. Admitting they transported the furnace to be inspected at Plaintiffs' request because they had only a small pickup, Milam argues that Plaintiffs did not present any evidence of what happened to the furnace after the inspection.

 

¶29 Both parties' authority on appeal for spoliation of evidence is Barnett v. Simmons, 2008 OK 100, 197 P.3d 12, in which the Court reviewed a denial of sanctions against the plaintiff for failing to comply with a court order requiring him to produce his computer's hard drive. Barnett did not involve a verdict-based judgment in a negligence action or a trial court's rulings on the parties' counter-motions for adverse inference jury instruction as a sanction for pre-litigation spoliation of evidence. However, it is the controlling authority in Oklahoma on a trial judge's authority and the requirements to impose sanctions for such conduct.

¶30 Pursuant to Barnett, trial judges have authority under 12 O.S. 2011 § 3237 to sanction for discovery violations and also "inherent authority" to impose sanctions for "abuse of the discovery process" and "abusive litigation practices or for abuse of judicial process, even if an order compelling discovery has not been made." Id., ¶ 14. "A litigant who is on notice that documents and information in its possession are relevant to litigation or potential litigation or are reasonably calculated to lead to the discovery of admissible evidence has a duty to preserve such evidence." Id., ¶20. The "duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." (Emphasis added.) Id.

¶31 As defined in Barnett, spoliation is "the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." (Emphasis added.) Id., ¶ 21. It "occurs when evidence relevant to prospective civil litigation is destroyed, adversely affecting the ability of a litigant to prove his or her claim." Id. Finally, "[s]poliation includes intentional and negligent destruction or loss of tangible and relevant evidence which impairs a party's ability to prove or defend a claim." (Emphasis added.) Id.

¶32 Additionally, in Barnett, the Court held the trial court had applied an erroneous standard for sanctions under [Title 12 O.S.] § 3237." Id., ¶ 27. Relevant to this appeal, the Court identified the factors the trial court should consider: 1) whether plaintiff failed to obey the court's order, 2) whether plaintiff violated his duty to preserve evidence; 3) the level of plaintiff's culpability; and 4) whether the defendant was unfairly prejudiced." Id. The order was reversed and remanded for reconsideration of the defendants' motion for sanctions.

Preliminary Issue Established by Barnett

¶33 The Barnett Court's first factor is not applicable to this case. Plaintiffs' alleged spoliation of evidence occurred two years before they filed their negligence action against Milam, so there was no discovery order to violate. As we interpret Barnett, a party's prelitigation spoliation of evidence may nevertheless be subject to sanctions under the trial court's inherent authority if certain threshold determinations are made.

¶34 The first determination is whether Plaintiffs (the alleged spoliating party) had a duty to preserve material evidence. Under Barnett and the facts of this case, said duty "arises ... before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." If the trial court finds Plaintiffs had a prelitigation duty to preserve evidence, it must then determine the remaining factors, i.e., did the alleged spoliating party violate that duty, their level of culpability, and the prejudice, if any, to Milam.

¶35 Review of the appellate record establishes the trial court did not rule on the Plaintiffs' bad faith, willfulness, or intentional conduct at pretrial, during the jury trial, or in the judgment on appeal. The absence of such rulings are contrary to Barnett. In accordance with Barnett, we hold the trial court, prior to allowing an adverse inference instruction, should determine whether there was sufficient evidence of willful, intentional and bad faith conduct.[11]

¶36 Unlike Barnett or an appeal from an order sanctioning a party by dismissal of the action, granting default judgment, or ordering payment of the other party's attorney fees, the subject appeal is from the judgment entered on a jury's verdict in a negligence action that lacks necessary evidentiary support for the trial court's sanction. We are guided here by two state court cases addressing the same omission in different contexts and applying the same standard.

 

¶37 In Yuanzong Fu v. Rhodes, 2015 UT 59, 355 P.3d 995, the Utah Supreme Court held the court's failure to make the ruling regarding willfulness before imposing a sanction of default judgment for a discovery violation did not require reversal, and "the sanction may be affirmed if the record and the court's factual findings demonstrates a basis for them." In a negligence case tried to a jury, Emerald Point, LLC v. Hawkins, 808 S.E.2d 384, 392-393 (Va. 2014) the appellant (landlord) argued that a spoliation instruction is inappropriate "in the absence of an express finding the responsible party acted in bad faith." As noted in the opinion, the trial court had ruled that the instruction would be given and stated the landlord "did nothing in bad faith." 808 S.E.2d at 391. Persuaded by the standard and rationale of the Federal Rules of Civil Procedure R. 37(e)(2)(B) for spoliation of electronic evidence and when "adverse inference" instructions are appropriate, the Virginia Supreme Court concluded "the evidence must support a finding of intentional loss or destruction of evidence ... before the court may permit the spoliation inference." Id., at 392-393. The Court reviewed the record and found no evidence that the landlord had intentionally destroyed the furnace. Considering that and other relevant facts,[12] the Court held the trial court erred by giving the spoliation instruction.

¶38 Based on these two cases, we find the absence of necessary rulings to support the sanction imposed during a jury trial under the trial court's inherent authority may be treated as harmless error and the sanction ruling affirmed "unless the ruling is contrary to the weight of evidence or to a governing principle of law." Barnett, ¶ 23. Consequently, we proceed with our analysis of whether the trial court abused its discretion in ruling on the parties' counter-motions for an adverse inference instruction.

Adverse Inferences in Oklahoma

¶39 The Oklahoma Uniform Jury Instructions-Civil (OUJI-Civil), Instruction 3.11, is titled "Inference from Failure to Produce Evidence or Witness" and states "NO INSTRUCTION SHOULD BE GIVEN." (Caps in original.) The "Notes on Use" explains "[i]n general, no instruction should be given for an inference from failure to produce evidence. However, in appropriate circumstances, an adverse inference instruction may be given as a sanction for spoliation of evidence." (Emphasis added.) Barnett is one of two authorities cited in the note to OUJI Instruction 3.11.[13]

¶40 Barnett discussed prior Oklahoma cases in which the Supreme Court had limited the severe sanctions of dismissal of the action and default judgments to willful or bad faith conduct, noting one exception in which they had affirmed a severe sanction for the parties' reasonably foreseeable destruction of evidence.

 

¶41 More recently, the Supreme Court addressed an adverse inference instruction in American Honda Motor Co. v. Thygesen, 2018 OK 14, 416 P.3d 1059. The Court reviewed a trial court order entered in a product liability case that sanctioned Honda for "destroying evidence," i.e., a computer program used for new model design that Honda had deleted under its routine policy twelve years prior to the plaintiff's accident. As punishment for Honda's inability to produce the program, the trial court ordered an adverse inference jury instruction be given at trial, which told the jury that it could infer that the computer program would be adverse to Honda's defense. The trial court was reversed on appeal, as discussed in ¶44.

Duty to Preserve

¶42 Our review of the court's sanction ruling for an abuse of discretion begins with the threshold determination of whether the record evidence supports the trial court's implied finding that Plaintiffs had a duty to preserve evidence as defined in Barnett. Unlike most of the spoliation cases this Court has reviewed, the trial court in this case was presented with the parties' conflicting arguments on the scope of the evidence that was spoliated, if any, in this negligence action. "When a party's duty to preserve evidence is contested, as well as what evidence, if any, was spoliated, the latter issue must first be resolved." Landry v. Charlotte Motor Cars, LLC, 226 So.3d 1053, 1056-1057 (Fla.App.Dist.2 2017).

¶43 The critical time for determining a party's duty to preserve is not specifically addressed in Barnett, but the facts the Court considered suggests the requisite knowledge must exist at the time relevant evidence is destroyed.[14] The Thygesen Court clarified that question when it held "because Honda was under no legal obligation to retain the computer program at the time it was deleted, and its deletion was pursuant to the routine, good-faith operation of Honda's document-retention system, Honda falls within [§] 3237(G)'s safe harbor" and the sanctions order "was not authorized by law."[15] (Emphasis added.) 2018 OK 14, ¶ 4.

¶44 Several courts have expressly reached that same conclusion. "A party must have been under a duty to preserve evidence at the time it was altered or destroyed." Nucor Corp. v. Bell, 251 F.R.D. 191 (D.C. S.Carolina 2008) (citing Silvestri v. General Motors Corp., 271 F.3d 583, 590 (4th Cir. (Md.) 2001).[16]

¶45 "The party alleging spoliation bears the burden of establishing that the nonproducing party had a duty to preserve the evidence." Brookshire Bros., Ltd. v. Aldridge, 438 S.W.3d 9, 20 (Tex. 2014). See also Duluc v. AC & L Food Corp., 119 A.D.3d 450, 452, (N.Y.A.D. 2014).

 

¶46 Beginning in 2013 with Milam's first motion for sanctions, it maintained Plaintiffs destroyed the furnace as it operated in the utility closet on the night of the CO poisoning. At the jury instruction argument stage of the trial, Milam specifically identified "the furnace in its specific environment ... that utility closet." It claimed "the case was not about just the furnace, but how a furnace was operating within a very specific environment," further asserting:

When the furnace was taken out of the closet without expert inspection and testing, it lost the opportunity to assess gas pressure, how the connection of the hose to the furnace to the gas line -- the seals on the furnace, its interaction with the plenum, how the flue pipe was configured, what role the hot water tank -- which was also gas powered in that same closet, played in this case.

¶47 Milam argued Plaintiffs had a duty to preserve evidence under Barnett at trial, relying on Mr. Akins getting two independent HVAC companies to "inspect" the furnace, calling and retaining the Law Firm, and then removing the furnace. Milam did not point to any testimony or evidence establishing how Plaintiffs reasonably should have known the furnace as it operated the night of the CO poisoning may be relevant to prospective litigation as required in Barnett. To establish the furnace's original operating condition was material and relevant to Plaintiffs' theories, Milam relied on Langley by Langley v. Union Electric Co., 107 F.3d 510 (7th Cir. (Ill.) 1997).[17]

¶48 Plaintiffs argued the furnace was the sole focus of both the first responders and their assistant HVAC expert, Mr. Reed, who also investigated it and the flue, turned the furnace on again, and the re-testing confirmed rising CO levels. He tagged the furnace out of service, not the gas hot water heater installed next to it in the closet. Plaintiffs also argued Milam and its insurer had never asked for the hot water tank to be preserved.

 

¶49 The trial court's decision to grant Milam's request for the adverse inference jury instruction was based solely on the furnace and flue as a "unit,"[18] explaining a gas furnace is not going to be placed in a home without venting.[19] This comment implies the court determined that Plaintiffs should reasonably have known the furnace and flue as a unit was material and may be relevant to prospective litigation and therefore had a duty to preserve the unit.

¶50 There is no dispute that the furnace itself is material evidence in this case. The fact that Mr. Akins stored the furnace in his shed after its removal suggests that he knew the furnace was material and might be relevant to prospective litigation. Further, our review of the record confirms that within hours of the CO poisoning incident, the furnace was the sole focus of both the firemen and the HVAC expert, Mr. Reed. After his investigation of the flue and the furnace, he turned the furnace on again and the re-testing confirmed rising CO levels. Although the closet included a gas hot water heater, it is undisputed Mr. Reed never considered it a problem and tagged out-of-service only the furnace.

¶51 There is no evidence Officer Breath or anyone else told Plaintiffs that Mr. Reed "did not know what was causing" the toxic CO, which might have put Mr. Akins on notice that something more than the furnace was the problem. Officer Breath confirmed that his police report stated Mr. Reed told him to have the homeowners "to call [Milam] first thing in the morning so that they could discuss the way they were going to fix this problem." According to Officer Breath he relayed Mr. Reed's statement to Mr. Akins, stating "Ya'll got to call Ben Milam in the morning, you know, or whenever you get out ... to check... and see what's going on."

¶52 Neither version of Mr. Reed's statement remotely suggests the furnace as it operated that night may be material or relevant. This was the sole information upon which Mr. Akins was operating when he was released from the hospital and called two HVAC companies for replacement quotes, retained counsel, and almost two weeks later accepted a quote for a heat pump. We conclude Milam has not carried its burden of proof to establish Plaintiffs reasonably should have known at the time the furnace was removed, that the furnace, in the original operating condition on the night of the family's CO poisoning, was material or may be relevant to prospective litigation.

¶53 We further find Milam's authority is distinguishable. First, unlike this case, the CO deaths in Langley were "presumably caused by an unventilated furnace" and the plaintiffs' theory of liability was the gas company acted negligently by providing gas service to the victims' home when it had reason to know their home contained improper or nonexistent gas fixtures. Therefore, in Langley, the linchpin was "how the furnace was hooked up, both at the time of the installation and at the time of the deaths." As a result, the removal of the furnace from its original operating condition is significantly more relevant in Langley than in this case where Plaintiffs' theories are failure to test for CO and failure to warn of hazardous conditions.

¶54 Second, the police officers simply took pictures of the furnace in Langley, whereas in this case, the local fire department tested the furnace as the cause of the CO immediately after the incident and after Mr. Reed's evaluation of the furnace and flue. Third, the furnace in Langley was never produced for testing of any kind by the gas company's experts nor any time thereafter. In this case by contrast, the parties' sanction motions, responses, and attachments demonstrate that both parties' experts attended the "initial test."[20]

¶55 We also conclude Milam has not carried its burden of proof to establish Plaintiffs reasonably should have known at the time the furnace was removed that the furnace's flue was material and might be relevant to prospective litigation. We agree the evidence supports the trial court's determination that a vent pipe or "flue" is a material part for safely operating a gas furnace because it transports the combustible gases produced by the furnace, both acceptable or toxic levels, through the attic and roof to the outside. However, the flue is not relevant to the key issues in this case, because the undisputed evidence establishes it transports CO, but does not produce it. More importantly, there is no evidence or testimony that Plaintiffs were aware of Mr. Reed's investigation of the flue and no testimony that Plaintiffs reasonably should have known the flue was material and relevant to prospective litigation.

 

¶56 Further, both parties' experts testified only that an obstructed flue or its cap would prevent the exhaust of CO outside, resulting in increased CO and decreased oxygen (O2) which could cause the burner's flame to roll-out, looking for O2 to burn. However, Milam's expert never testified about what else, if anything, the flue would have shown had it been produced or made available for testing that would have been relevant to the specific cause of the CO production and/or how it would have helped their defense. Both parties' experts further acknowledged Mr. Reed's evaluation of the furnace included checking up the flue with his flashlight from inside the utility closet, about which he testified he found no soot indicating incomplete combustion. Mr. Reed also used his ladder to climb on the roof where he checked the flue and vent cap for obstructions like a bird nest again using his flashlight. Although Mr. Reed testified he did not check the flue in the attic, Milam elicited no testimony from Wilhelm about any possible defects in that part of the flue, that had it been available, would have shown or would have helped their defense in any way.

¶57 Additionally, the record is void of any evidence or testimony that Plaintiffs reasonably should have known the gas hot water heater was material and relevant to prospective litigation when Plaintiffs removed it two months after the night of the CO poisoning. Milam's defense that the gas hot water heater could have also produced the toxic CO fails to consider that gas appliance operated in the same closet for almost two months after the gas furnace was removed, without incident.[21] Not only did Milam's expert admit during cross examination that he was not aware of that fact, he also admitted the only way CO gets to people from a gas hot water heater is if there's a problem with the gas furnace. Milam's defense also fails to consider the furnace's initial testing yielded 2000 ppm of CO (testing levels), proving it alone was capable of producing the toxic levels on the night of the Plaintiffs' CO poisoning. Defendant's expert faulted the initial testing because only a 3-4 ft. flue was used, instead of a 10 ft. flue, which in his opinion a CO test in such a short flue would naturally get higher readings. However, he admitted the high CO result at the initial test was too high for any gas furnace to produce and was abnormally dangerous.

¶58 Assuming, arguendo, Plaintiffs had a "duty to preserve all of the evidence in the utility closet environment, the flue and/or hot water heater," Milam did not present any evidence that Plaintiffs' removal of the furnace and flue from the closet was done in bad faith, willfully, or intentionally. Instead the jury heard testimony of reasonable explanations for Mr. Akins' actions after he was released from the hospital: 1) he did not call Milam as requested because he had trusted them three prior times and no longer did, 2) he replaced the gas furnace because of concern for his family's safety, 3) he did not know what happened to the flue when the gas furnace was removed from the closet, and 4) 2 months after the CO poisoning incident a new electric hot water heater was installed and the gas-powered hot water heater was discarded.

¶59 A party is not automatically entitled to a sanction just because evidence is destroyed or altered. Shimanovsky v. General Motors Corp., 692 N.E.2d 286 (Ill.1998). A court must consider the unique factual situation that each case presents, and apply the appropriate critera to these facts in order to determine what particular sanction, if any, should be imposed. Id. See also Landry, supra ("A determination that evidence has been spoliated does not inevitably lead to the imposition of sanctions under the threefold inquiry").

¶60 An adverse inference jury instruction is considered a severe sanction in some federal courts. See Rimkus Consulting Group, Inc. v. Cammarata, 688 F.Supp.2d 598 (S.D. Texas 2010) (citing Pension Committee of University of Montreal Pension Plan v. Bank of America Securities, 685 F.Supp.2d 456, 467 (S.D.N.Y. 2010). The giving of such instruction in civil cases is a powerful sanction as it "brands one party as a bad actor" and "necessarily opens the door to a certain degree of speculation by the jury." Henning v. Union Pacific R. Co., 530 F.3d 1206, 1219-1220 (10th Cir. (Okla.) 2008)(quoting Morris v. Union Pac. R.R., 373 F.3d 896, 900--01 (8th Cir.(Ark.) 2004).

¶61 An adverse inference jury instruction is considered a "harsh remedy" for spoliation. Brookshire Bros. 438 S.W.3d at 14. See also Carroll v. Kelsey, 234 S.W.3d 559, 565-566 (Mo.App. 2007) (the instruction requires "evidence showing intentional destruction of the item ... [which]... must occur under circumstances which give rise to an inference of fraud and a desire to suppress the truth."). Evidence of intentional destruction or bad faith is required before a litigant is entitled to a spoliation instruction. Henning, at p. 1220. In Texas, a party must intentionally fail to preserve evidence in order for a spoliation instruction to constitute an appropriate remedy. Brookshire Bros., 438 S.W. 3d at 24. See also Emerald Point, LLC, 808 S.E.2d at 391-392.

¶62 Plaintiffs had a duty to preserve the furnace. It is undisputed that Plaintiffs gave no notice to Milam of their plan to replace the furnace and no opportunity to inspect and/or test the original scene before the furnace's removal. The jury heard Milam's numerous questions to Mr. Akins during cross examination about "its rights" to have been contacted and to examine and/or test the furnace before its removal. Unlike the majority of spoliation/sanction cases in which the parties had no notice until a petition was filed, Milam received notice of Plaintiffs' potential claim through its insurer sufficient to protect its interest. Milam's claim that Plaintiffs violated their duty to preserve the original operating condition and their defense to Plaintiffs' claims were prejudiced thereby is unpersuasive considering the fact that Milam's insurer requested only to inspect "the furnace" when responding to Plaintiffs' notice one week before the furnace was removed.

¶63 In this case, the undisputed record evidence establishes Plaintiffs did not violate their duty with regard to the furnace, having instead sufficiently discharged it by preserving and then presenting the furnace to Milam in good working condition for testing. See Landry, 226 So.3d at 1057 ("Assuming that Ms. Landry had a duty to preserve the vehicle, [she] only had to preserve the vehicle so that the Dealership would have an opportunity to examine it."). Plaintiffs' level of culpability was, at best, negligent, and such conduct does not warrant an adverse inference jury instruction in this case.

¶64 Oklahoma has yet to recognize spoliation as an independent tort. Patel v. OMH Medical Center, Inc., 1999 OK 33, ¶ 48, 987 P.2d 1185. In Texas and Oklahoma, "[s]poliation is an evidentiary concept, not a separate cause of action." Brookshire Bros., 438 S.W.3d at 19-20; Harrill v. Penn, 1927 OK 492, ¶ 9, 273 P. 235 (describing spoliation as a "wholesome principle of the law of evidence."). "Evidentiary matters are resolved by the trial court." Brookshire Bros. The same applies in Oklahoma, especially with spoliation of evidence. See Barnett.

¶65 As a consequence of the trial court's failure to determine pre-trial the parties' counter-motions for sanctions, especially the threshold question of the duty to preserve evidence as to each party, the trial court allowed the jury to hear testimony and evidence bearing on whether spoliation occurred in this case and the level of culpability for the same. Such evidence has no bearing on "any fact that is of consequence to the determination of the action," and was irrelevant and therefore inadmissible. 12 O.S. 2011 §§ 2401 and 2402. We concur with the detailed analysis of the Court in Brookshire Bros. and agree "[t]he tendency of such evidence to skew the focus of the trial from the merits to the conduct of the spoliating party raises a significant risk of both prejudice and confusion of the issues." 438 S.W.3d at 26.

¶66 The confusion of issues in this case was compounded by the trial court's submission of an adverse inference jury instruction for Plaintiffs' "failure to produce" that does not identify "the evidence" the trial court had impliedly determined they had violated their duty to preserve. Plaintiffs' spoliation of the evidence was indirectly raised during voir dire and opening statements, but it was the primary focus during closing arguments. The irrelevant evidence relating to the spoliation circumstances together with the adverse inference instruction unfairly branded Plaintiffs as bad actors and prejudiced their rights to a fair and just trial in this state.

CONCLUSION

¶67 We reverse the judgment based on the jury's verdict in favor of Milam, and remand the case to the trial court for a new trial in accordance with this opinion.

¶68 REVERSED AND REMANDED.

GOREE, V.C.J., and MITCHELL, J., concur.

FOOTNOTES

[1] Emails attached to Plaintiffs' response to Milam's motion to reconsider conclusively establishing the testing location was chosen by Milam and that Milam had transported the furnace there at Plaintiffs' request because their truck was too small to keep the furnace in its original operating condition, i.e., standing upright. Plaintiffs' responses to Milam's motions attached numerous depositions establishing Milam's expert, Mr. Hergenrether, also attended the initial test. He testified it was a "nondestructive test, so we weren't able to remove the burners or heat exchanger" and "someone working on behalf of the Plaintiffs had limited the test to being an operational test...not a destructive examination of the furnace." This confirms Dr. Block's deposition and trial testimony that the test was just to determine if under optimal conditions the furnace produced CO in excess of the normal limits, not to determine the specific cause.

[2] Section 140 provides "[i]n all cases in which it is made to appear to the court that a fair and impartial trial cannot be had in the county where the suit is pending, the court may, on application of either party, change the place of trial to some county where such objections do not exist."

[3] Despite the counter-sanction motions, neither party sought to exclude any evidence regarding the alleged spoliation of evidence.

[4] It is clear from the record all of the supporting evidence and testimony necessary to decide the parties' counter-allegations of spoliation in 2007 had been presented to the second trial judge.

[5] There is no pretrial conference order included in the appellate record. The jury instruction, "Issues in Case- No Counter-Claim" states Plaintiffs claim Milam was negligent "when it serviced" their furnace. However the evidence presented during Plaintiffs' case in chief supports both theories that counsel specified during opening statement.

[6] Plaintiffs' expert, Mr. Prach, testified the furnace should be shut down if readings of 400 ppm or above are exhibited.

[7] According to Adkins, gravity-style gas furnaces "just have burners," the heat from which creates a gravity draft and pulls like a chimney with a fireplace. Unlike the older models, he testified the new furnaces have a fan with an induction motor that creates a draft to get the combustion air in and get the flue gases out.

[8] Mr. Adkins testified "flame rollout" is where the flame comes out of the compartment from where it's supposed to be, then burns the wires to the furnace blower. He agreed: 1) flame roll-out "could be" a sign of combustion gases leaking into the upper section of the furnace; 2) incomplete combustion can cause the furnace to produce more CO; and also 3) when CO is not being properly vented from a combustion chamber, the oxygen level goes down and the flame "rolls out" seeking oxygen to burn.

[9] As given to the jury, Instruction No. 20, "Adverse Inference Stemming from Plaintiff's Spoliation of Evidence" reads:

If Plaintiffs to this case have failed to offer evidence within their power to produce, you may infer that the evidence would be adverse to Plaintiffs if you believe each of the following elements:

(1) The evidence was under the control of the party Plaintiffs and could have been produced by the exercise of reasonable diligence;

(2) The evidence was not equally available to [Milam];

(3) A reasonable prudent person under the same or similar circumstances as Plaintiffs would have offered the evidence to [Milam] if [Plaintiffs] believed the evidence would have been favorable to Plaintiffs; and

(4) No reasonable excuse for the failure has been shown by Plaintiffs.

[10] Plaintiffs also argue the adverse inference instruction, as given, is prejudicial because it improperly includes Mrs. Akins and D.N., who was a minor at the time of the CO poisoning, when referring to "Plaintiffs" when there is no evidence either had anything to do with the decision to remove the furnace or its removal.

[11] "A trial court has the inherent authority to sanction a party or an attorney for bad faith litigation misconduct." Garnett v. Government Employees Ins. Co., 2008 OK 43, ¶ 18, 186 P.3d 935. However, in Walker v. Ferguson, a finding of bad faith or oppressive behavior was required where the trial court has imposed sanctions on the basis of its inherent or equitable power. 2004 OK 81, ¶ 14, 102 P.3d 144. As authority for the required finding, Walker cites Roadway Express Inc. v. Piper, 100 S.Ct. 2455 (1980), in which the U.S. Supreme Court reversed an order awarding attorney fees and remanded the case, holding, in part, that "the trial court did not make a specific finding as to whether counsel's conduct constituted ... bad faith, a finding that would have to precede any sanction under the court's inherent powers." (Italics and underline added.) 100 S.Ct. at 2465.

[12] The Court in Emerald Point explained "the evidence showed that the furnace was disposed of only after it sat for more than one year in a maintenance bay before being discarded," the landlord's action "resulted at worst from negligence," and the tenants did not demonstrate that it was motivated by any desire to deprive them of access to the furnace as material evidence in probable litigation." 808 S.E.2d at 393.

[13] The second authority is Harrill v. Penn, 1927 OK 492, 273 P. 235.

[14] The Barnett Court found the plaintiff: 1) was aware that his hard drive was subject to a discovery request, and 2) wiping software programs were downloaded on his computer when both parties' counsel were actively working to produce the hard drive. After the court order to produce the hard drive, the plaintiff also hired a computer expert to work on the computer without informing the expert about the order and also without informing the defendants' counsel of the work about to be done. See id., ¶ 22.

[15] The Thygesen Court held the trial court abused its discretion by failing to consider 12 O.S. 2011 § 3237(G), which prohibits sanctions for a party's "failure to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system." The Court further found there was nothing in the record to indicate the program deletion was the result of something other than routine operation of Honda's retention system or that Honda was operating the system in bad faith when the program was deleted twelve years ago. See ¶¶ 2-3.

[16] See also Teal v. Jones, 222 So.3d 1052 (Miss. App. 2017) (spoliation instruction not warranted in alienation of affection action; insufficient evidence to show ex-wife deliberately or negligently destroyed emails on her computer at a time when she knew or should have known that they might contain evidence relevant to the case).

[17] Four family members perished from CO poisoning in early 1991 in their home "presumably from an unventilated furnace." The Langley Court affirmed the sanction, finding the personal representative who removed the furnace delayed inspections several times without informing UEC the furnace had been lost and was at fault for the furnace's loss (poor judgment in choosing the storage site) and for lack of candor on its loss.

[18] The court stated, "And they're one unit ... it's like taking half of the car. And if you've got half of the car, and the other party is responsible for the whole car and they only produce half the car, then there's cause for concern, and the instruction is proper." The trial judge finally concluded, "So I'm going to grant the requested adverse inference instruction, because I think that - the testimony you have revealed that there was a 3- or 4-foot tall pipe that was used in testing, and that the pipe needed to be at least 10 feet tall, and what happened -- during part of that 10 feet, I don't know, but I think it's important to know."

[19] Based on personal experiences of his own furnace and vent pipe connections, the trial court explained his concern, inter alia, about what the testimony showed and what it did not, i.e., whether the flue went straight through the attic and roof or was connected in the attic to the gas hot water heater's flue before exiting the house.

[20] Milam's counsel consistently referred to this test as Dr. Block's test, as though he was the only expert present at the test and during which he did not determine a specific cause for the excessive production of CO by the furnace.

[21] Wilhelm confirmed during the two week period after the CO incident the furnace was not being used and the gas hot water heater "was still being used." He was then asked, "so in that two week time frame, until the furnace is replaced, its pretty clear the hot water heater wasn't putting out CO, right?" Following his "um..." response, the question was rephrased "if it was putting out [CO], there would have been another poisoning, right?" He answered, "Not with the furnace not running, where it was pulling [CO] back through the return plenum." Q: So the only way that the hot water heater puts out [CO] that gets to people is if there's a problem with the furnace? A: Yes.

 






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 2004 OK 81, 102 P.3d 144, WALKER v. FERGUSON
Discussed
 2008 OK 43, 186 P.3d 935, GARNETT v. GOVERNMENT EMPLOYEES INSURANCE COMPANY
Discussed
 2008 OK 100, 197 P.3d 12, BARNETT v. SIMMONS
Discussed at Length
 2018 OK 14, 416 P.3d 1059, AMERICAN HONDA MOTOR CO. v. THYGESEN
Discussed at Length
 1999 OK 98, 996 P.2d 438, 70 OBJ 3640, Nealis v. Baird
Discussed
 1927 OK 492, 273 P. 235, 134 Okla. 259, HARRILL v. PENN
Discussed at Length
 1999 OK 33, 987 P.2d 1185, 70 OBJ 1353, Patel v. OMH Medical Center, Inc.
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 2401, Relevant Evidence Defined
Cited
 12 O.S. 3237, 12 O.S. 3237, Failure to Make or Cooperate in Discovery - Sanctions
Discussed at Length


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA